P. T. WOODWARD v. THE STATE.

No. 1941. Decided June 29, 1900.

1. **Murder—Discharge of Jury—Plea of Former Jeopardy—Submission of to Jury.**

On a trial for murder, where defendant interposed a plea of former jeopardy on account of the discharge by the court, over defendant's objection, of the jury without a verdict on a previous trial of the case because a child of one of the jurors was dangerously ill; Held, the plea should have been submitted to the jury under proper instructions, and it was error for the court to strike out the same on motion of the district attorney.

2. **Plea of Former Jeopardy—Judicial Knowledge.**

A court is presumed to take judicial knowledge of its previous action and rulings in the case; and, consequently, a plea of former jeopardy is not insufficient and defective because it does not set out in full the indictment, verdict, and previous judgment, since the court can and will take judicial notice of these matters pertaining to its own records.

3. **Same—Discharge of Jury—Constitutional Law.**

The statute, Code of Criminal Procedure, article 737, which authorizes the discharge of the jury in a felony case where one or more of the jurors become so sick as to be unable to perform jury service, or "where any accident or circumstances occurs to prevent their being kept together," does not violate article 1, section 14, of the Constitution, which declares that no person, for the same offense, shall be twice put in jeopardy of life or limb.

4. **Same—Serious Illness of Juror's Child—Necessity.**

Under article 737, Code of Criminal Procedure, which provides for the discharge of the jury, "where any accident or circumstance occurs to prevent their

being kept together," the serious and probably fatal illness of the child of one of the jurors is a circumstance of such necessity as authorizes and justifies the discharge of the jury. That which unfits a juror for the performance of his duty creates a legal necessity; and, such unfitness may result from mental suffering no less than from physical pain. Davidson, P. J., dissenting.

5. Discharge of Jury—Mistrial.

The discharge of the jury and the ordering of a mistrial under our statute, is a matter of necessity resting in the sound discretion of the trial judge. If the facts he finds and announces in his judgment show a legal necessity for such action the court, on appeal, will affirm his judgment; if no such necessity is shown the judgment will be reversed.

6. Murder—Evidence—Declarations of Deceased.

On a trial for murder, the declarations of deceased to a third party as to his fears that defendant would kill him, where defendant was not present when the declarations were made, are hearsay, irrelevant, incompetent and inadmissible as evidence, and they are not rendered competent by improper questions asked the witness, on cross-examination by defendant, relating in part to what was said by deceased at the time in question.

7. Same.

On a trial for murder, where there was a contest as to whether deceased had stated that defendant had stepped from the brush and shot him, or, slipped up and shot him from the brush; testimony that persons living in the timber were said to be living in the brush was inadmissible, it not being made to appear that defendant knew anything about the matter as to what was meant by "brush" or "timber" in that community.

8. Same—Evidence too Remote.

On a trial for murder, testimony as to what defendant may have said some ten or fifteen years before the killing about deceased and sisters, which in no manner tended to illustrate or throw light upon matters pertaining to the trial, was inadmissible as well as too remote.

9. Same—Acts of Defendant.

On a trial for murder, evidence is incompetent and inadmissible to prove that defendant was armed at a certain time and place not long before the killing, where it was not shown that deceased was at or near said place at said time, nor was in any manner connected with the incident.

10. Impeachment of Witness as to New Matter Elicited on Cross-Examination.

Where a witness, on cross-examination, is asked about and testifies to entirely new matter not pertinent to any matter drawn out on his examination in chief as to such new matter, he becomes the witness of the party cross-examining him, and such party can not impeach him, as to such new matter.

11. Evidence—Antecedent Acts and Conduct of Defendant.

On a trial for murder it was incompetent and inadmissible to permit the prosecution to prove that long prior to the trial defendant had been arrested and paid a fine in the city court for a disturbance of the peace; such evidence not tending to prove his guilt or innocence in the case on trial.

12. Same—Acts and Conduct of Defendant's Family.

Unless the acts and conduct of defendant's family in some way throw light upon defendant's actions or the intent with which he acted at the time of the homicide, evidence as to the same is clearly inadmissible.

13. Same—Evidence too Remote.

On a trial for murder, evidence of declarations made by defendant as to criminal intimacy between deceased and his, defendant's, wife, and between deceased and another woman, twelve or fifteen years before, was inadmissible and too remote to shed any light upon the acts and conduct of defendant at the time of the homicide.

14. Same—Evidence as to Declarations, Motive and Intent of Deceased.

On a trial for murder, evidence to prove the declarations of deceased as to what his intentions were, or would be, made to a third party and not in the

presence of defendant, can not be used as a predicate to establish motive, animus, and intent of defendant at the time of the killing.

**15. Same—Evidence too Remote.**

On a trial for murder, evidence of a conversation between defendant's wife and other persons, which occurred eleven years before the homicide, about a cattle transaction in no manner shown to be connected with the homicide, and not proving or tending to prove animus and intent on the part of defendant at the time of the homicide, is inadmissible.

**16. Same—Impeachment of Witness—General Reputation.**

On a trial for murder, evidence as to general reputation of a female witness for want of chastity, is inadmissible.

**17. Dying Declarations.**

Dying declarations are admissible in evidence under the laws of this State and come within the purview, letter and spirit of the Constitution.

APPEAL from the District Court of Tarrant. Tried below before Hon. W. D. HARRIS.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of J. H. Ragland, on the 3d of July, 1898, by shooting him with a gun. Defendant and deceased were brothers-in-law, defendant having married a sister of deceased. The following statement of the case is taken from the brief of appellant:

On the third day of July, 1898, appellant left his home and went by his pasture and salted his stock and then to the residence of Bill Johnson, where he remained until late in the afternoon. After he had been at Johnson's house for some time, deceased came and remained until some time in the afternoon. Johnson had some whisky there and deceased took several drinks. Deceased and appellant were talking friendly at first, but later on deceased became offended and challenged appellant to fight him a duel the next morning at 7 o'clock at the end of the lane where the shooting occurred. The evidence is conflicting as to whether or not appellant agreed to fight a duel with deceased. State's witnesses Bill Johnson and Os. Lowe, who testified that they were present and heard it, state that appellant agreed to fight a duel. Appellant denies this and states that he refused to fight a duel, and that he and deceased left Johnson's together to go to Geo. Davelin's, about one-fourth of a mile away. Davelin was quite sick. They were on horseback and just before reaching Davelin's, deceased rode off and left appellant, and appellant then turned around and rode back and stopped at Bill Johnson's. Some time after that deceased came back by Johnson's, on his way home, and hallooed to appellant, who was sitting on Johnson's gallery, and told him to meet him in the morning in the lane and fight a duel; after repeating it once or twice appellant replied, "all right." He states, however, that he said this at the suggestion of Bill Johnson, and that he had no intention of meeting deceased, or of fighting a duel. Late in the evening appellant started home and stopped at the house of T. H. Hanna, who was a tenant on his farm, and went inside the

lot gate and was standing holding his horse when Bill Johnson came up to the gate next to the road. Appellant then left Hanna and went out to the gate and was sitting down talking to Bill Johnson and Hanna when Hanna informed him that deceased was coming, and asked him to leave. Appellant then left the gate, going south through his plantation along the road from Hanna's house to his own, leading his horse. He went some distance down the hill back of Hanna's house and remained there about fifteen minutes when he again started back towards the gate where he had been talking with Johnson for the purpose, as stated by him, to get a horse out of the pasture which was just across the road from said gate, to take him with him for his little boy to plow next day. After he started back as aforesaid, he was met by Hanna, who informed him that deceased was out in the public road in front of Hanna's house with a shotgun and sixshooter. Appellant then turned on his horse and went home. He rode up to his yard gate, got down and hitched his horse and went up to the house to get his double-barreled shotgun, took it out in the yard, fired it off and went back to the house and reloaded it; he then got on his horse and started back to the pasture to get his horse to plow next day, taking his gun with him. When he reached the cotton field which runs up to Hanna's house, he turned to the right and struck the big road east of Hanna's house. On his way he stopped to examine some shocks of wheat to see if it was dry enough to thresh. On reaching the fence at the big road, he hitched his horse to a post in the fence and took his bridle on his arm, got through the wire to the big road and started west in the direction of his pasture gate. In front of Hanna's house was a lane which extended north to deceased's house; the big road ran east and west; at the corner of this lane leading to deceased's house was a large post about sixteen inches in diameter and some six or seven feet above the ground. This post was on the east corner of the lane where it comes out into the big road. Deceased was by this big post, either behind it or partly behind it, and when defendant got about southeast from said post the shooting began. Deceased stated in his dying declarations that defendant shot first; that he slipped up from the brush and shot him; that he shot him from the hedge. There was a hedge west of the post, but none south or east and no hedge or brush in the direction that the shot came from. The defendant denies this statement and says that it is untrue; and says that the first he knew of deceased's presence at the post was when deceased burst a cap at him; that at that time he had his gun on his shoulder; that he then brought it over and fired as quick as he could; the deceased fired the other barrel of his gun at him about the same time; that defendant's first shot went above deceased's head; that he then fired a second shot lower down, which is the shot that killed deceased. Deceased had two wounds in his right leg between the knee and the hip joint, on the outside of his leg; also one shot on the inside of the left leg above the knee; also two shots in the right side just above .

the hip bone. The course of the balls indicated that deceased had his right side towards defendant and that he was facing east; the evidence also showed that deceased was left handed and was in the habit of shooting a gun from the left shoulder. The shooting occurred about 8 o'clock at night, just after dark, and deceased lived until about 4 o'clock next morning, when he died. Defendant and deceased were brothers-in-law, defendant having married a sister of deceased. They were close neighbors and lived on adjoining farms, the defendant's farm being on the south side of the Mansfield and Dallas road, except sixty acres of land, which was on the north side of that road, and on the west side of the lane leading from the big road in front of Hanna's house to deceased's house. Deceased owned the land on the right of this lane and on the north side of the big road. Defendant testified that it was his intention at the time the shooting occurred to get his horse out of the sixty-acre pasture, which was on the north side of this big road, and that was his business there at that time, and that deceased knew of his intention to come after the horse, he having told deceased that it was his intention to do so that morning while they were at Bill Johnson's.

The evidence shows that the defendant and deceased had some trouble about ten or eleven years ago in regard to a cattle transaction and that for four or five years they were not on speaking terms, but that some four or five years ago they talked the matter over and made friends and agreed never to mention the cattle matter again. It also appears from the testimony that the deceased on several occasions since then and during the last year or two threatened to kill defendant and attempted to do so on one occasion in Mansfield, on account of the cattle trouble, and on the day of the homicide, while at Bill Johnson's, deceased told defendant that he had laid in the brush seven years to kill him and that he would get him yet. It also appears from the testimony of J. C. Loyd, Jake Back and others that defendant told them some twelve or fifteen years ago that he, defendant, on one occasion while out fishing on the river in company with deceased and deceased's sister, Mrs. Emma Lowe, and others, saw deceased having sexual intercourse with his own sister, Mrs. Emma Lowe, but there is no testimony showing that deceased was ever informed of the fact that defendant made this statement, or that he knew defendant saw him having sexual intercourse with his sister.

The matter with regard to the defendant's plea of former jeopardy on account of the discharge of the jury at the previous trial, is fully stated in the opinion. The opinion also states the other questions discussed so fully as to need no further illustration from the record.

*M. B. Harris, W. R. Parker,* and *W. B. House,* for appellant, filed an able and elaborate brief containing 127 typewritten pages, which, owing to its length, can not be reproduced.

*O. W. Gillespie* and *Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for ten years.

Bill of exception number 2, together with the judge's explanation, is as follows:

"When the above case was called for trial on November 14, 1898, defendant filed his special plea of jeopardy in bar herein, which plea is as follows, to wit:

" 'Comes now defendant, P. T. Woodward, in the above cause, and for special plea in bar herein says that the State ought not to further prosecute this cause against him, because he says that heretofore, to wit, on the 13th day of October, 1898, in this court, after having been duly arraigned and having entered his plea of not guilty, he was in due form of law put upon trial upon the indictment herein, and pleaded thereto not guilty, after the jury had been duly impaneled and sworn to try said cause, and the indictment had been read to them, and that thereafter two days were consumed in the admission of testimony in behalf of State; that on, to wit, the 15th of October, 1898, while said trial was yet in progress, and before the State had concluded its testimony in chief, the court announced that he was informed of the illness of the child of E. M. Daggett, one of the jurors in said cause, and informed defendant and his attorneys that said juror's child was seriously ill; that the court submitted to the defendant and his attorneys several propositions, to which defendant replied in writing that he was not in a position to make any agreement as to the disposition of the cause, and declined to do so, but that thereafter defendant and his attorneys agreed, and each requested the court, that said juryman be sent to his sick child, and that it be done in any way the court saw fit, and further requested that the other jurymen be not forced into the sick room where said child was; that the court thereafter submitted to defendant and his attorneys the question as to whether they would consent to the discharge of the jury and the continuance of the case, to which proposition defendant then and there declined and refused to agree, whereupon the court of its own motion, and without the consent of defendant, and over his objections, and without any legal cause whatever, discharged said jury from a further consideration of said cause. Exhibit A, attached thereto, is now referred to and made a part of this plea. Wherefore defendant says that in the manner and form aforesaid he was placed in jeopardy for the same offense of which he is now here being, about to be, and is being prosecuted; and of this he prays judgment, and that he be adjudged acquitted of said charge, and that he go hence without day. [Signed.] P. T. Woodward.

" 'Sworn to and subscribed before me on this 14th day of November, 1898, by P. T. Woodward. [Signed.]    R. H. McNatt, District Clerk.'

"Exhibit A:  'The State of Texas v. P. T. Woodward.  The following proceedings were had in the above cause, and in the following order:  10-13-98.  Defendant arraigned in open court and pleaded not guilty. . 10-13-98.  The jury impaneled and sworn to try said cause.  10-13-98.  Indictment read to jury and defendant pleaded not guilty.  10-13-98, and 10:15 o'clock a. m.  The court having submitted to defendant and his attorney as to whether they would agree to the entire discharge of the jury and a continuance of the case, and defendant and his attorney having failed to agree, and the court having submitted to them whether they would agree to impanel another juror instead of E. M. Daggett, and having failed and refused to agree, and in response to each of said propositions having reported in writing as follows, to wit:  "Comes now the defendant, P. T. Woodward, and says that he is not in a position to make any agreement as to the disposition of this case, and therefore declines to make any agreement in reference thereto.  Defendant requests that the contents of this paper be not made known, and the fact of such refusal be not communicated to any juror in this case.  [Signed] P. T. Woodward,"—and the court having submitted the question as to whether they were willing for the juror Daggett to separate from the other jurymen and go in charge of an officer to attend the bedside of his child, they, defendant and his attorney, each requested that the said E. M. Daggett be sent to his child, and that it be done in any way the court saw fit, and requested that the other jurymen be not forced into the sick room where the said child was; and the court, having heard the evidence as to the condition of said child of the juror E. M. Daggett, ordered that the jury be discharged, and the jury was discharged, to which defendant then and there excepted.'

"Whereupon counsel for State filed a motion to strike out and no further consider said special plea of former jeopardy, which motion is as follows, to wit:

" 'Comes now the State, by counsel, and moves the court to strike out and no further consider the special plea of former jeopardy filed herein by defendant on this, the 14th day of November, 1898, for the following reasons, to wit:  Because the same is insufficient in law, and same fails to comply with law, in that the judgment of this court upon the matter complained of is not set forth as a part of said plea, and because the court judicially knows that this defendant has not heretofore been in jeopardy at this term of the court upon the indictment herein.  O. W. Gillespie, J. M. Elliott, J. W. Swayne, attorneys for State.'

"Which motion to strike out, etc., was sustained by the court, and to which action of the court defendant then and there excepted, and now here tenders this bill of exceptions," etc.

"Approved, with the explanation that it is not true that Exhibit A

shows all the facts with reference to the suspension of the former trial. For evidence as to what they were I refer to the judgment or order entered in passing on defendant's special plea. When the special plea was presented as here written, and the motion to strike out was presented, the real facts of the former proceedings, as shown by the record in this court and in this case, was taken into consideration by the court. There was no claim made, and is none now, that the record as made was not strictly true; and it being a matter of which the court could take judicial notice, and one of the defendant's attorneys having stated to the court that, if the court was not going to sustain the special plea, he wanted the ruling made on it before it was presented to the jury, as, if it was presented to the jury and then not sustained, it might prejudice defendant's rights or defense of not guilty. Whereupon the action shown by the record was taken with reference to said special plea, and the plea that was filed was never in any manner made known to the jury. As to the correctness of the action of the court in suspending the former trial I have no doubt. If it was incorrect, then we need some amendment to our law; for, if it should make good a dozen pleas of former jeopardy, this court would not, under such circumstances as were presented with reference to the juror Daggett, keep a father away from his dying child."

The following is the order of the court discharging the jury, which appears in the record, and to which the judge refers in his qualification to the bill of exceptions:

"The State of Texas v. P. T. Woodward.   October 15, 1898.   On this, the fourth day of the trial of this cause, it appearing to the court that the child of E. M. Daggett, one of the jurors sworn and impaneled to try this cause, was dangerously ill and would probably die, and that the said child was only seven years of age, and absolutely needed the presence and assistance of said E. M. Daggett, the court thereupon informed defendant and his counsel of the condition of said juror's child; that thereupon defendant in person and by his counsel in open court consented that said juror E. M. Daggett be excused from further service upon the jury, and that the trial of said cause proceed with the eleven jurors remaining,—the said Daggett then leaving his place in the jury box, and also the court room, unattended by any officer; that within a few minutes after the said Daggett left the jury box and court room the court ordered a deputy sheriff to immediately find the said Daggett, and instruct him not in any way to talk to any person about this case, nor allow anyone to talk about the same to him, and to remain with the said Daggett, and not get out of the sight or presence of said Daggett, and as soon as practicable to bring the said Daggett back into the court room; and the said sheriff did in, to wit, fifteen minutes after the said Daggett left the court house, reach the home of said juror, and remain with said juror; that two hours and twenty minutes after the said Daggett left the said court room as above stated

said deputy sheriff returned into open court with the said Daggett; that thereupon the court put the said Daggett upon oath in open court as to whether he had talked or conversed with anyone about this case, and it appeared to the court that the said Daggett had not in any manner whatever talked to or allowed anyone to talk to him about this case, nor was said case talked about in the hearing or presence of said juror; that thereupon defendant in person and by his counsel failed and refused to agree to a discharge of the jury in this case, and the granting of continuance as on defendant's application; that defendant in person and by his counsel failed and refused to agree for said juror Daggett to retake his place in the jury box and for this trial to proceed so soon as the condition of said child would admit of the same; that defendant in person and by his counsel failed and refused to agree for another juror to be chosen in the place of the said Daggett, and for this trial to be commenced anew; that said defendant and his counsel failed and refused to agree for said juror Daggett, accompanied by an officer, to separate from the rest of said jurors to attend his sick child. And thereupon defendant and his attorneys prepared, and the defendant signed and presented to the court, a written instrument, as follows, to wit: 'The State of Texas v. P. T. Woodward. In the 17th District Court of Tarrant County, Texas. To the Hon. W. D. Harris, Judge of said Court: Comes now the defendant, P. T. Woodward, and says that he is not in a position to make any agreement as to the disposition of this case, and therefore declines to make any agreement in reference thereto. Defendant requests that the contents of this paper be not made known, and the fact of such refusal be not communicated, to any juror in this case. [Signed] P. T. Woodward.' That thereupon the court heard further evidence of the condition of said child from the said E. M. Daggett and from Dr. W. A. Duringer, the physician attending the said child; and it appearing to the court from the evidence that the said child was in a very critical condition, and would probably die, and that a surgical operation would very probably have to be performed upon said child, and that in the performance of same it would be absolutely necessary for him to be attended by his father, the said E. M. Daggett; that said E. M. Daggett was no longer in a mental condition to serve upon said jury; that the presence of the entire jury in and around the sick room and bed of the said Daggett's child could not be allowed,—it is therefore ordered and adjudged that the jury in this case be discharged, and that a venire of 150 men be drawn and summoned for trial of this case on November 14, 1898; said venire to be made returnable on the —— day of November, 1898. To all of which the defendant excepts."

We think the court erred in striking out the plea of former jeopardy, but should have heard the evidence on the same, and, after hearing the evidence on the trial, as well as upon the plea of former jeopardy, have submitted the law applicable to the plea of jeopardy to the jury,

and had the jury pass upon the same under proper instructions. Grisham v. State, 19 Texas Crim. App., 504. It is not necessary in this case that the plea set up the indictment, verdict, and judgment in full, as the court must take judicial knowledge of the orders and decrees entered in its own court; and especially is this true when those orders and decrees were made in the case then on trial. We hold that the appellant's plea of jeopardy was in compliance with the law, and that the court erred in striking the same out on account of defective pleading, and also erred in failing to submit the issue as above stated to the jury under proper instructions. It is unnecessary to cite other cases than the Grisham case, supra, on the proposition that it is the duty of the trial court to submit the question of jeopardy to the jury.

The temporary absence of the juror Daggett, the evidence showing that he did not converse with anyone about the case and was only gone a short time, as shown above, would not, of itself, operate as jeopardy in behalf of appellant. Woodson v. State, 40 Texas Crim. Rep., 685; Walker v. State, 40 Texas Crim. Rep., 544; Jackson v. State, 37 Texas Crim. Rep., 128; Upchurch v. State, 36 Texas Crim. Rep., 628; Foster v. State, 25 Texas Crim. App., 543; Robinson v. State, 21 Texas Crim. App., 162. After the juror Daggett had returned to the jury, as shown above, upon the proper showing, by affidavit of Daggett and Dr. W. A. Duringer, the physician attending, it is made to appear that the child of juror Daggett was in a very critical condition and would probably die, and that a surgical operation would very probably have to be performed upon the child, and that in the performance of the same it would be absolutely necessary for him to be attended by his father, Juror Daggett; that said Daggett was no longer in a mental condition to serve upon said jury; that the presence of the entire jury in and around the sick room and bed of said Daggett's child could not be allowed. Thereupon the court ordered the discharge of the jury. Appellant insists that the action of the court in the premises entitled him to a successful plea of former jeopardy upon this trial. This brings up for our consideration the constitutionality of article 737, Code of Criminal Procedure, which provides: "If after the retirement of the jury in a felony case any one of them becomes so sick as to prevent the continuance of his duty, or any accident or circumstance occur to prevent their being kept together, the jury may be discharged." There is a similar statute in effect in most of the States, and one was in effect in this State at the time of the adoption of the present Constitution, and the courts have uniformly upheld the same. At the time the Constitution was adopted "former jeopardy" had a distinct and positive meaning attached to it by the laws then in force. The courts of the country had frequently had occasion to interpret the word "jeopardy" as contained in our Constitution, prior to the adoption thereof, and the Constitution was adopted with that construction placed upon the word "jeopardy." Every provision of the Constitution must be given a

rational and reasonable construction,—one that comports with and is in consonance with justice and humanity. Lastro v. State, 3 Texas Crim. App., 363. Article 1, section 14, of the Constitution provides: "No person for the same offense shall be twice put in jeopardy of life or liberty, nor shall a person be again put upon trial for the same offense after verdict of not guilty in a court of competent jurisdiction." Thus it will be seen there are two characters of jeopardy inhibited by the Constitution. One is that a person shall not be put in jeopardy of life or liberty, and the other is that he shall not be put upon trial for the same offense after verdict of not guilty. This, we take it, is a constitutional recognition of the fact that various emergencies and necessities arise during the progress of the trial authorizing the discharge of the jury, for otherwise we can see no occasion for two clauses in this section; that is, the Constitution intended to mean that if a person is on trial for his life, and the child of a juror is dying, this evidently was in the contemplation of the Constitution builders, as one of the necessities and emergencies authorizing the discharge of the jury, and that jeopardy did not accrue.

The leading case, prior to the adoption of our Constitution, on this question, is Perez v. United States, 9 Wheaton, 579, 6 Lawyers' Edition, 165. In this case the jury were kept together for such length of time as to render it altogether improbable they would agree on a verdict, and were discharged. Mr. Justice Story, for the court, said: "We think in all cases of this nature the law has invested courts of justice with authority to discharge a jury from giving in a verdict whenever, in their opinion, taking all the circumstances in consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject, and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, that power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases, especially, courts should be extremely careful how they interfere with any of the chances of life in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious discharge of this discretion rests, in this as in other cases, upon the responsibility of the judges under their oaths of office." The principle laid down in this decision is well recognized in most of the courts of the United States. We note, in passing, that the clause of the Constitution of the United States is to all intents and purposes similar to our own. The principle upon which this decision is rendered is recognized by Mr. Bishop in his work on Criminal Law (section 1035), and the general proposition is maintained that when any necessity arises, during the progress of the trial, which, in the exercise of the sound discretion of the court, demands a discharge of the jury, then such necessity precludes a successful plea of jeopardy on

the part of defendant.    In Parsons v. State, 22 Alabama, 53, the court, in passing upon a similar question, said: "It certainly requires no argument to show that, if the wife or child of a juror is at the point of death, he would not be in a state of mind to discharge the duties which devolve upon him with that degree of patience, calmness, and deliberation due in the investigation of cases of this magnitude and importance, and it would unquestionably be the duty of the court to discharge a juror under such circumstances.    We would go still further, and extend the application of the principle to every case in which it appears that the sickness was of a character which demanded the personal attention of the juror; but, unless this does appear, the court would not be authorized to discharge a jury on this ground."    This salutary principle is also recognized by the Supreme Court of Alabama in Hawes v. State, 88 Alabama, 65, 7 Southern Reporter, 302 (see also State v. Davis, 31 West Virginia, 398, 7 Southeastern Reporter, 24; Hilbert v. Commonwealth [Kentucky], 51 Southwestern Reporter, 817), and is also recognized in this State (see Powell v. State, 17 Texas Criminal Appeals, 345; Schindler v. State, 17 Texas Criminal Appeals, 408). This is a judicial declaration that one clause of the quoted article above is constitutional, and the decisions are based upon the necessity of the occasion.    If the jury can not agree, and the judge in his discretion so declares after considering the facts, unless there is a clear and manifest abuse of this discretion, we will not review the action of the trial court discharging the jury.

This, as stated, is based upon the law of necessity.    Why keep a jury together that can not agree?    Then the same law of necessity will necessarily uphold the other clause of the article; that is, that clause which reads: "Or any accident or circumstance occur to prevent their being kept together, the jury may be discharged."    As stated, a similar statute to the one here considered was in force at the time of the adoption of the present Constitution, and had received judicial interpretation in this as well as other States.    There is no just reason for holding one clause of this statute constitutional and the other unconstitutional. Therefore we conclude that the accident or circumstance, whichever it may be termed, of the serious sickness or dying condition of a child whose father is serving on the jury, is clearly within the statutory grounds, and authorizes the court to discharge the jury.    To hold otherwise would be making the service upon the jury in many instances an instrument of torture, instead of discharging the duties of citizenship. Certainly, when the Constitution says that no one shall be placed twice in jeopardy of his life or liberty, it did not contemplate that the judge should not have the power to discharge the jury under circumstances indicated in this bill.    In Upchurch v. State, 36 Texas Criminal Reports, 628, the principle here announced was upheld; but the judge in that case discharged the jury without the presence of the defendant and at night, after the court had adjourned for the day, and it does not appear that any real emergency or just reason for the discharge was made manifest

upon the subsequent trial of the case.   In every instance where the jury is discharged, there should be an adjudication of the fact authorizing the discharge by the court before the discharge is made.   This seems to be the general trend of decisions in this State.   Mr. Cooley, in his work on Constitutional Limitations (page 339), reads:  "A person is in legal jeopardy when he is put upon trial before a court of competent jurisdiction, upon indictment or information which is sufficient in form and substance to sustain conviction, and the jury have been charged with his deliverance; and a jury is said to be thus charged when they have been impaneled and sworn.  *  *  *  If, however, the court had no jurisdiction of the cause, or if the indictment was so far defective that no valid judgment could be rendered upon it, or if by any over-ruling necessity the jury are discharged without a verdict, which might happen from the sickness or death of the judge holding the court, or of a juror, or the inability of the jury to agree upon the verdict after reasonable time for deliberation and effort, or if the term of the court as fixed by law comes to an end before trial is finished, etc., then these and other grounds are causes for discharge of the jury, and jeopardy is thereby avoided."   He cites various authorities to support the text, whereby the court is authorized to discharge the jury for overruling necessity.

Our views upon this question are so well and aptly expressed in Stocks v. State (Georgia), 18 Southeastern Reporter, 847, that we feel constrained to copy the following as applicable to this case:  "The foregoing instances are given more for the purpose of showing that the courts are not limited to exceptions already made than because of any direct bearing those mentioned may have upon the case now in hand. All of these exceptions were founded upon the doctrine of necessity; but, in deciding as to what constitutes a necessity, the courts, as we have seen, have not been governed by an inflexible standard, and have not felt bound to confine themselves to physical or absolute necessity, but have extended the doctrine as the ends of justice seemed to require. The tendency, as was said by this court in the case of Nolan v. State, 55 Georgia, 524, 'has been to lower the standard, so as to comprehend moral as well as physical necessity, and, in the region of the moral, to be content with very moderate tests.'   That which unfits a juror for the performance of his duty creates a legal necessity, and such unfit-ness may result from mental suffering, no less than from physical pain. As civilization and refinement have progressed, there has been a grow-ing disposition on the part of the courts to recognize the influence of the feelings and emotions upon the mind, as producing this necessity. In the case of Commonwealth v. Fells, 9 Leigh, 613, the court regarded the condition of a juror's wife, who was about to give birth to a child, as presenting a strong case of necessity.   In the case of State v. Tat-man, 59 Iowa, 471, 13 Northwestern Reporter, 632, while the defend-ant was on trial for a felony, the presiding judge received a telegram

from his home to the effect that his wife was sick, and he thereupon adjourned the court until the following Friday, on which day he ordered a final adjournment. On the following Monday his wife died. At a subsequent term the defendant was again put on trial on the same indictment, and pleaded former jeopardy. The plea was overruled, and the Supreme Court affirmed the ruling. In Hawes v. State, 88 Alabama, 60, 7 Southern Reporter, 302, it was held that the illness of a juror's wife presented such a necessity as authorized his discharge. See also Parsons v. State, 22 Alabama, 52. A case which closely resembles the one we are now considering is that of State v. Davis (1888), 31 West Virginia, 390, 7 Southeastern Reporter, 24, where information was imparted to one of the jurors, after the greater part of the evidence had been heard in a felony case, that his son had just died. It was held that a necessity existed for the discharge of the juror, and that he was properly discharged, and that the court could substitute another juror in his place and proceed with the trial de novo. We think the action of the court below in this case is sustainable upon sound principle, as well as upon authority. One whose mind is disturbed and distracted by sudden grief is certainly in no condition to discharge the grave and responsible duty of trying another for his life. What judge would be in a fit condition to preside on the trial of a capital case, upon being summoned to the deathbed of his wife, his child, or his mother? And would any court hold that a judge who is informed, while trying a case, that his wife had just died, can not return to his home, and attend her funeral, but must go on with the trial? No man of ordinary sensibilities, it seems to me, would be in a proper state of mind to discharge his functions as a judge on the trial of a case under such cirumstances, and he should not be compelled to do so. As was said in the case of State v. Tatman, supra, 'the law makes no such inhuman requirements.' If what has been said is true as to a judge, it is equally true as to a juror. In order to perform his duty properly, he must give his close and undivided attention to the testimony as delivered by each witness, and to the law as given in charge by the court. He must carry both in his mind, and carefully apply the one to the other, and it is often necessary that he should make nice distinctions in the application of the law. It is not to be expected that a juror will perform this duty properly under the circumstances shown by the record in this case. The question to be considered is, not whether the juror, in view of the greater importance of trying the prisoner than of paying the last tribute of affection and respect to his departed mother, should put aside his grief, and proceed undisturbed in the performance of his duty, but whether, as a matter of fact, he is capable of doing this. If not, the ends of justice require that he be discharged from the jury. What was said by the court in the case of State v. Davis, supra, where the juror was discharged on account of the death of his son, will apply equally in the present case: 'Observation teaches us, if, indeed, we have not learned

from sad experience, that the natural result of information suddenly imparted to a father of the death of a child is to unfit him for the time to attend to business. It would have been cruel to have required the juror to remain on the jury under such circumstances. His grief would naturaly unfit him for the discharge of such an important duty; and if, as the court said in the Fels case, the object of the trial is to obtain a fair, just, and impartial verdict, there is little prospect of it, under such circumstances. This is one of the cases spoken of in the opinion in that case, where a juror is, from the peculiar condition of his mind and feelings, manifestly disqualified from bestowing on the case that attention and impartial consideration which is necessary to a just verdict. * * * But it is said in the present case that the judge should not have informed the juror of his mother's death, and that, whether this was proper or not, it was unnecessary to have discharged the jury, as the trial could have been suspended, and the juror sent, in the charge of a bailiff, to attend the funeral. In reply to the first of these suggestions, I will say, for myself, that it would have been cruel and inhuman to have kept the juror confined, without the knowledge of his mother's death; and to have required him to remain in the charge of a bailiff while attending her funeral rites would have been equally so, when, according to the oath of the bailiff, he could not speak to the juror himself or allow others to do so. To attend the funeral of a parent is regarded by the civilized world as a high and sacred duty, and funerals are often postponed to the last possible moment in order that some son or daughter from a distant place may attend. What would be thought at this day of a judge who would inform a juror that his wife or mother had just died, but that, in consequence of the duty imposed upon him to try a man for a criminal offense, he could not be excused, and must put aside his grief, and give his whole attention to the discharge of his duties? We are satisfied that, under the facts of this case, the presiding judge had the power and authority to discharge the juror, and declare a mistrial, and that the plea of former jeopardy was properly overruled. Our Constitution provides that 'no person shall be put in jeopardy of life or liberty more than once for the same offense, save on his or her own motion for new trial after conviction, or in case of mistrial.' So it will be seen that the question which has so long agitated the courts in different States, as to the right of the judge to declare a mistrial, has been settled in this State by our organic law. The granting of a mistrial is the act of the judge. He alone can grant it, and he alone, in the exercise of a sound discretion, must determine what facts would be sufficient to authorize him to grant it. Where the jury fail to agree, he is to determine, from the length of time they have had the case under consideration, and by conferring with them, whether they will be able to agree or not. In declaring a mistrial, he must, as stated above, exercise a sound legal discretion. He can not do it capriciously. If the facts which

he finds and announces in his judgment show a legal necessity for a mistrial, a reviewing court will affirm his judgment. If no such necessity is shown, his judgment will be reversed."

Bill number 7 complains that the court permitted Mrs. Ellen Lowe to state that while she was riding home with deceased, late in the evening, deceased told her that he was afraid appellant would kill him; that he (appellant) had two pistols on him that day. Appellant objected on the ground that it was hearsay, irrelevant, immaterial, and not binding on appellant, he not being present, and the proof not showing that he was ever informed of said statement. The judge qualifies the bill with this statement: "Appellant, on cross-examination, had voluntarily asked witness a part of what was said by deceased (Ragland) at the time in question, and the State was only permitted to call for, and the witness to tell, the other part thereof on the same subject and at the same time." We do not understand that, owing to the mere fact that appellant should ask questions at one time that were not proper, the State would be authorized to prove facts highly prejudicial to the rights of appellant. The court erred in permitting the witness to so testify.

Bill number 8 shows that while Mrs. Ellen Lowe was on the stand she was permitted, on redirect examination, to testify that deceased told witness, the evening of the homicide, while on the way to her home, that Woodward had been following him all day with two pistols. Appellant objected, because "hearsay, immaterial, and not binding on defendant, he not being present, and not being informed of same, and was inadmissible for any purpose." The judge qualifies this bill: "That on cross-examination by defendant he voluntarily asked witness as to part of the conversation she had with and statements made by deceased at the time referred to, and the State was then permitted to ask the witness for the other part, and the above was such other part according to her testimony." As indicated above, we do not think this testimony was admissible for the reason stated under bill number 7.

Bill number 9 complains that the court permitted J. C. Talley, witness for State, to testify that persons living in the timber in that community were said to be living in the "brush," to which defendant objected, because irrelevant, immaterial, incompetent, and hearsay, because there was no evidence that deceased knew or ever heard of such facts, and because said testimony is inadmissible for any purpose. The court qualifies this bill as follows: "That there was quite a sharp contest as to whether deceased had stated that defendant stepped up from the brush and shot him, or slipped up and shot him from the brush,—defendant endeavoring to show that deceased must have told an untruth because there was no brush or hedge within shooting distance of the place of killing, and the testimony of some of the witnesses showing the shooting occurred on the prairie, and that defendant lived in the edge of the timber; and the State was allowed to ask if there was, within the knowledge of the wit-

ness, any expression in general use by the public in that community with reference to persons living in the timber, and the witness had answered there was, and then made the answer complained of." We can not see how or in what way this testimony was admissible. The explanation, to the effect that there, was a controversy as to what was meant by the "brush" or "timber," does not explain the matter. There is nothing to indicate that defendant knew anything about this, or that the defendant had the same knowledge as the witness had of the matter.

Bill number 16 complains that the court permitted J. K. Porter to answer the following questions propounded by the State: "State to the jury whether or not you ever heard Woodward say anything with reference to Joe Ragland, or his sisters,—any one of them. A. I think I have. Q. When was it? A. Twelve or fifteen years ago. Woodward told me about going on a fishing trip on the river with Joe Ragland and his sister Emma and others, and said that Joe got on his horse and took his sister Emma up behind him, and they rode off, and I understood that Joe had illicit intercourse with his sister Emma." *To such questions and answers appellant objected on the ground that the same were immaterial, irrelevant, and incompetent,* did not prove any issue in the case, were never communicated to Joe Ragland, were remote, and were the conclusions of the witness, and because there had been a reconciliation between deceased and defendant after said statement was made. We think this testimony was entirely too remote. It does not tend, as we understand the record before us, to elucidate or explain any mental condition of appellant at the time of the homicide; nor does it indicate that out of this conversation, which took place ten or fifteen years before the homicide, an animus against deceased had grown up on the part of appellant. It was of a very highly prejudicial character. The bill shows it was never communicated to Joe Ragland, and yet this was introduced before the jury, and must necessarily have prejudiced the rights of appellant. We do not think the testimony illustrates or throws light upon anything in the trial of this case.

Bill number 18 complains that the court permitted Mrs. Ida Lowe, sister of deceased, to testify that she saw defendant with a pistol at old lady Ragland's one night when she was sick, not long before the killing. Appellant's objection to this testimony is that the same is irrelevant, immaterial, and incompetent, because it was not shown that deceased was at or near said place at said time, and no evidence that defendant wanted or intended to injure deceased with said pistol, nor that deceased was in any manner connected with the incident. This bill also shows that the court permitted Mrs. Eliza Ragland (wife of deceased) to state that on the night of June 4th she was defendant at old lady Ragland's with a weapon,—a pistol; that he also had a shotgun there; that she saw it; that defendant said he brought a gun there, and some one had stolen it, or it was misplaced; that it was not where

he put it. Appellant objected to this testimony on the same ground as above. We do not think this testimony was admissible. It is too remote to pertain to any issue raised in this case. If appellant was carrying the pistol some time prior to the killing, he might be prosecuted and convicted of that offense, as he was carrying it unlawfully; but in the light of this record we do not think this testimony was admissible.

Bill number 19 complains that the court permitted the following proceeding: "While Con Harrington was on the stand for defendant, he was asked by State's counsel, on cross-examination, "if defendant did not tell him [witness], after the other trial of the case, that Bill Johnson's testimony was exactly true, except that Bill did not tell about Ragland's lying in the brush seven years,' which question witness answered in the negative. Whereupon State's counsel asked the further question: 'Didn't you, in Swayne's office, in the presence of Swayne and Bill Johnson, say that after the trial Woodward told you that Bill Johnson's testimony was exactly true, except that Bill didn't tell about Ragland's lying in the brush seven years?'—which question witness answered in the negative. Thereafter the State introduced Bill Johnson, and asked him if Con Harrington did not, in Swayne's office, in the presence of Swayne and himself, state that after the other trial Woodward told him that his testimony was exactly true, except he (Johnson) didn't tell about Ragland's lying in the brush seven years, which question witness Johnson answered in the affirmative. Defendant objected to each of said questions and answers, because it was affirmative matter, and not a matter about which the witness Harrington could be impeached, having been brought out. by the State; was not material; was a failure of witness to testify to a fact advantageous to the State, and the witness could not be impeached that way; that his answers were hearsay testimony, and as being a reference to a former trial of this case, and unlawful." The court appends the following explanation: "That on cross-examination of the witness Bill Johnson there had been a strong effort to throw discredit on his testimony, and the witness Con Harrington had on his examination in chief shown that he was quite a willing witness for defendant; and the inquiry first made of the witness on cross-examination was apparently intended to be for the purpose of showing, or a step in the direction of showing, that defendant had in substance indorsed what Bill Johnson had now said. When witness denied, then the county attorney was allowed to ask the other question, as explaining why he had asked the other question, and to contradict Harrington by witness Bill Johnson. But the jury at the time were told, and in the charge were also told, that it could not be considered, except for certain purposes, etc. As to the exception that reference was made to another trial, such reference had been made by the attorneys for the defendant in selecting a jury, and by other witnesses in their testimony, and was made by defendant himself while

testifying. So the fact of a former trial was well known to the jury, but nowhere did the State seek to go into the details of any of the proceedings of that trial." We know of no statute that precludes a reference to a former trial. We do not think that this testimony was admissible, after a careful consideration of this bill of exceptions. It was highly prejudicial to the rights of appellant, and was permitting the State to contradict its own witness, since the State made Con Harrington its witness in this matter; nothing of the kind having been asked by defendant's counsel.

Bill number 20 complains that the court erred in permitting R. A. House and Frank Ramsey, each, while on the stand, to testify that appellant was arrested by the city marshal of Mansfield, Texas, and paid a fine in the city court on account of a disturbance in a malt-tonic joint there, to which appellant objected on the ground that same was irrelevant, immaterial, and incompetent, did not tend to prove any issue in the case, and was not admissible for any purpose or for impeachment. The bill is approved, with the explanation "that these witnesses, or at least the witness House, in testifying about the trouble between defendant and deceased at Mansfield, had made it appear that deceased alone was in fault at the time in question; and there was some evidence showing both were in fault, and this evidence was admitted to rebut the idea that defendant was not in any way to blame," etc. It certainly is not proper to permit proof that defendant was arrested by the city marshal of Mansfield, and paid a fine in the city court, on account of a disturbance in a malt-tonic joint, long prior to the trial of this case. It does not make any difference whether defendant or deceased was at fault in reference to the trouble. If it became pertinent to prove previous troubles, antecedent malice, and former grudges between the parties, this would be admissible; but clearly it is not permissible to prove that he was arrested and paid a fine, and does not prove or tend to prove his guilt or innocence on this trial.

Bill number 24 complains that the court permitted Tommy Woodward and others to testify that he and his mother and little brother and little sister left home on the night of the killing, soon after defendant left there with his gun, and that they went through the pasture and cotton field, and while they were going through the cotton field, in the direction of Hanna's house from where they lived, they heard the shooting, and that they got to Hanna's house and the place of the shooting soon after the shooting occurred; that Tommy Woodward, while on the stand, was asked if he and those with him were not bareheaded when they went over there that night, and witness replied that he did not know whether they were bareheaded or not; that afterwards, when T. H. Hanna was on the stand, he was asked by the State if little Tommy Woodward and the others were not bareheaded when they came to her house that night. Defendant objected on the ground that the same "was irrelevant, im-

material, and incompetent, and was not binding on defendant, he not being present, and was not admissible for any purpose." If the State could show that appellant knew his family had left home bareheaded, under the impression that defendant was going to engage in a deadly conflict, either by his actions or by his direct statements to that effect, then this testimony would be admissible; but, unless the conduct of appellant's family in some way throws light upon the actions of appellant or the intent with which he acted at the time of this homicide, the same would clearly not be admissible.

J. K. Back, witness for State, was permitted, as shown by bill number 25, to testify about declarations made by appellant of criminal intimacy between appellant's wife and Joe Ragland, and also about cattle transactions that occurred years before, and also as to criminal intimacy between deceased and Mrs. Emma Lowe twelve or fifteen years before. As indicated in previous statements herein, we do not think this testimony was admissible, the same being too remote to shed any light upon the conduct and acts of appellant.

Bill number 27 is as follows: "While J. C. Talley was on the stand for State, he testified that he saw deceased, a few minutes before the killing, in the lane at the post where the killing occurred; that just before that he was going down the lane on his horse from towards deceased's house, and saw deceased sitting down on the side of the lane, about 100 yards north from the post; that he (deceased) got up, and walked south to the end of the lane, and sat down by the post. Whereupon witness was asked by counsel for State the following: 'When Joe Ragland stopped at the post, just as he was stopping, what did he say he was going to do?' And the witness was permitted to answer: 'Says, "I am going to stay here until in the morning at seven o'clock to fight a duel with Woodward."' Defendant objected to this testimony because same was immaterial, irrelevant, incompetent, and hearsay; not binding on defendant, he not being present; did not hear it and had never been told about it; same was unnecessary to explain testimony brought out by defendant, and is not res gestae. The court overruled the objections and instructed the jury: 'That testimony is admitted only for the purpose of throwing light upon the intentions or purposes of Ragland at the time he stopped there, his statements accompanying the acts, if the jury does believe that it does throw light upon his intentions or purposes in stopping there, but not for the purpose of showing or tending to show that defendant knew that he made such statement or statements, or had such intentions and purposes, as you may believe he had, if you believe he had any, from making the statement. I will repeat it: The statement made by Ragland, accompanying the act of stopping there, is admitted for the purpose of showing what intent or purpose Ragland had in stopping there, if the jury believe it does show any purpose, and not for the purpose of showing that defendant knew he made the statement, or of showing that defendant knew what his

purpose or intent at the time was.' To which remark of the court de-fendant excepts, on the ground 'that the effect of said remarks and repe-tition of them was to emphasize that part of same which refers to the purpose and intention of Ragland, and states he stopped there, and intimates to the jury that the purpose of said Ragland in stopping there was to remain until seven o'clock the next morning to fight a duel.' " In addition to the above, the court appends this explanation to the bill: "On the trial, defendant testified that he had informed deceased that was going to get his horse out of pasture, and testified to a state of facts tending to make it appear that deceased's purpose in stopping at the post was to waylay defendant; and this evidence was admitted as a statement by deceased, accompanying his act in stopping, to throw light upon his purpose, if the jury believed it did so. This was admitted as rebuttal evidence, and not until defendant had testified in the case, and was properly limited in the charge." This testimony was not admissible for any purpose. Certainly, as to what the motive of deceased was in stopping could not be charged to defendant, unless knowledge of that motive was brought home to defendant, and he was acting under the same motive. Deceased might have stopped at the post, as indicated in the bill, for the purpose of staying all night and fighting a duel in the morning. It may have been that defendant had no such motive or intention. Certainly, to prove a declaration of de-ceased, not in the presence of defendant and without any knowledge of defendant as to what his intentions were or would be, could not be used as a predicate to establish motive, animus, and intent of defendant at the time of the killing.

Bill number 28 complains that the court permitted to be introduced in evidence a disgreement between deceased and defendant, about eleven years ago, in regard to a cattle transaction, in which deceased branded some cattle claimed to belong to defendant while defendant was away from home. Afterwards, while Mrs. Eliza Ragland was on the stand for State in rebuttal, she testified that, on the day when her husband branded and took possession of the cattle, Mrs. Woodward was at her house. The following questions were asked by State: "What took place between Mrs. Woodward and your husband in reference to the cattle? A. She had given Mr. Ragland a note for $100 and said she wanted to pay the note with cattle." We do not see how this evidence is admissible in this case. The bill does not show that appellant was apprised of this conversation. Furthermore, it having occurred eleven years before, it could not be admissible on the trial of this case, unless it in some way was connected with it. It does not illustrate, nor prove, nor tend to prove, animus or intent on the part of appellant at the time of the homicide herein charged.

Bill number 29 complains of the court permitting several witnesses to testify to the general reputation for chastity of Mrs. Emma Lowe in

the community where she lived. As indicated in several previous bills of this character, we do not think this testimony was admissible.

In bill number 34 appellant complains of the court permitting the dying declarations of deceased to be introduced in evidence. This question has been settled too often against the contention of appellant to require any elaboration at our hands. Dying declarations are admissible under the laws of this State, and we think they come within the purview, letter, and spirit of the Constitution.

We have carefully examined the lengthy charge of the court, and think it is a clear and proper presentation of the law applicable to the facts, save and except that portion of same which proposes to limit the testimony admitted of the deceased, about him staying all night to fight a duel next morning with defendant, as indicated in one of the bills discussed above, and held to be inadmissible. This is one of the most voluminous records ever presented to this court. Appellant's brief contains 127 pages, and the transcript 288 pages. It occurs to us that there is no occasion or necessity for anything of this kind. We have carefully reviewed all of appellant's assignment of error, and, save and except as above indicated, we find no error in the record. For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, PRESIDING JUDGE.—I concur in the reversal of the judgment. I further believe that the plea of jeopardy is well taken and should have been sustained. The majority hold that it should have been submitted to the jury under instructions of the court. If the reasoning of Judge BROOKS in regard to jeopardy is correct, it should have been held by my brethren that the plea of jeopardy was not well taken, because that is the sum and substance of the opinion as rendered by Judge BROOKS. I recognize no rule of necessity which overturns any of the reserved constitutional rights. All rules of necessity must be within the Bill of Rights and Constitutional guarantees. Neither courts nor legislatures have the right to create necessities which are antagonistic to, or have the tendency to overturn, the constitutional reserved rights. If the Powell case, 17 Texas Criminal Appeals, 345, decided anything, it did this proposition. All the authorities agree, so far as I know, that whenever a party has been placed upon his trial, pleaded not guilty, and jeopardy has attached, courts and legislatures have no authority or right in law to create a necessity which takes from his this right of jeopardy. I do not propose to enter into a full discussion of the matter at present. My brethren have held that upon another trial this issue should be submitted to the jury, and if the matter comes again it will be time enough to enter into a discussion of the question. I simply now enter my dissent to the opinion as it stands on this question in this case.