## H. D. CAVE V. THE STATE.

*No. 362.　Decided May 9.*

**1. Abortion—Information.**—In a prosecution under article 538 of the Penal Code for an attempt to produce an abortion by means of a drug or medicine, it is not necessary for the information to allege what drug or medicine was administered. Following Watson v. The State, 9 Texas Crim. App., 237.

**2. Continuance.**—It is not error to refuse a continuance where the proposed absent testimony could have no weight whatever in determining the issue involved in the case.

APPEAL from the County Court of Fisher. Tried below before Hon. S. PATTON, County Judge.

This appeal is from a conviction upon an information charging appellant with an attempt to produce an abortion on one Livie Brown, a pregnant woman, by then and there administering to her, with her consent, certain drugs and medicines well calculated to produce an abortion upon her, etc. The punishment assessed was a fine of $110. This is a companion case to that of Willingham v. The State, ante, p. 98.

Livie Brown testified: "My name is Livie Brown. I reside in Fisher County, Texas, about twelve miles west of Roby, the county site. In August of 1892 I was pregnant, and Barton Willingham, a young man who lives in my neighborhood, came to my house one day and I went with him out to a straw-stack near by, and he went round and brought the defendant around to where I was. I was standing on the side next to the house. We three had a talk about my pregnant condition, and about what kind of medicine would make me miscarry it. Willingham had been giving me calomel, but it did not make me miscarry, so defendant said he could give me medicine that would make me miscarry the child, but that if I took it I must do so on my own responsibility, and that he would advise me not to do it. I told him all right, that I wanted to get shut of the child. In a few days defendant came to my house, came in the house, and brought me a powder he called calomel, and told me to take it and say nothing about

it to no one.  I took it; it made me sick and made my bowels to act freely.  I had taken calomel before, and this affected me as did the calomel.  Then he told me to take this powder, three doses a day, two hours apart, until I took it all.  In a few days after this he brought me a red looking medicine and gave me a dose of it himself; this was a fluid medicine.  He told me to take twenty drops of it at a dose, three times a day, and it would abort me.  I took this medicine as he directed, and it caused sharp, short, quick pains in my back and abdomen.  The pains would originate in my back and protrude downward to my abdomen—very much such pains as I had when my child was born.  I do not know the name of the medicine, nor did defendant know what it was, but that it would abort me.  I took all of this medicine as defendant directed.  [A bottle was here handed her.]  This is the vial, and looks just like the one I speak of, and will hold about one ounce.  About a week and a half after defendant brought this medicine he returned again and brought me a dark looking powder, about a pint; also a bottle of turpentine and a bottle of whisky.  [Two bottles were here handed her.]  This is the bottle that had the turpentine in it, and this is the one that had the whisky in it.  He dosed me a dose as follows:  Two teaspoonfuls of the dark powder, one teaspoonful of the turpentine, and enough whisky to dissolve it all, in a cup, handed it to me and told me to take it, and to take the same kind of a dose at night and morning until I miscarried.  When he handed me the cup, in talking with him, I set it on the table.  He then went out of the house and I took it as he directed.  I took a dose of this night and morning as he directed until I took all the powder and nearly all the turpentine.  There was left in the turpentine vial about a half inch of turpentine.  In about two weeks defendant returned, brought me some more of the black powder and some alcohol, and expressed himself as being greatly surprised that the medicine given had not already aborted me.  This turpentine and powder affected me very greatly; gave me quick, heavy pains in the back and abdomen.  The pains were almost as bad and very like the pains I had in childbirth.  I was taking no other medicine, and took no other medicine, except what defendant gave me, during all this time.  This all occurred in Fisher County, Texas."

Cross-examination:  "In May, before this, I told my father that I needed some medicine; that my periods were not regular.  He went to Sweetwater and brought me back some brown pills.  I took them; they affected my bowels a little, and this was the only effect they had on me.  My father did not know I was pregnant.  Willingham gave me calomel before defendant gave me any of this medicine.  The first time I talked to defendant was out at the straw-stack with Willingham; this was private between us three.  Yes, Mr. Cave came to our house one evening.  I don't know how he came to come there.  I don't

know whether father waved him by or not.  It was late in the evening, and father and my sister, after sitting awhile, went out and got supper.  I and my little brother remained in the house with defendant. I did not ask him this time for any money.  I never asked him for any money until after my child was born, in November, 1892; nor did I ask him then to give me any money, but wanted to borrow of him $30 for father, in February, 1893.  The first time he ever gave me any money was one day he came to our house and gave me $2 and told me to buy clothing for my babe.  I kept the $2, but did not feel right to keep it, so one day shortly after this I gave it back to him in the presence of my sister Orrie, and told him I did not feel like taking money that way from strangers.  It was sometime after this that I borrowed the $30 from him for father.  Mr. Cave often told us he had money, and seemed to want us to take it; would pat his pocket and say he had money, and offered to give us money frequently.  Father was needing money badly, so one day I told him that defendant seemed to have a good deal of money, and he told me when he came again to borrow $30 for him, and tell him he would repay it as soon as possible.  So I did so, and defendant let me have the money.  Yes, if you will make me answer, I will tell you the whole truth.  [Here witness broke down and cried.]  Defendant offered us money at one other time.  Defendant come to our house about a month and a half after my child was born, and he, I, and my sister were sitting in the room together talking. Defendant took out a $5 bill, threw it my lap, and said, 'If you girls will let me stay with you to-night, I will give you that and as much more as you want.'  I threw it in the fire and told him to leave; that I was not that kind of a girl.  My father was not at home when this occurred.  Yes, I did allow one man to be intimate with me.  I am not a loose girl, though I did give up my virtue to one man and no other.  It was Jim Copeland, to whom I was engaged to be married. I never married him.  He left the country.  These are the only times defendant gave or loaned us any money.  Before the time I borrowed the $30 I told Mr. Cave that father was going to put this whole matter in court; that father had said that the law should take its course with men who would come and ruin his family while he was away.  I thought all along defendant was offering us money as hush money, because he would beg us to keep it out of court; that it would send him to the penitentiary and ruin him and his family.  Defendant often begged me not to swear against him, and if I was called to court to not tell anything; but I told him if I was called in court I would swear the truth.  Defendant offered at one time to send me off to school in another State, or to get me into business somewhere where I was not known.  He said he would furnish the money to send me off; would see Barton Willingham and have him to put up some of the money. He never did it, though.  This was after my child was born, in Febru-

ary or March, 1893. I told father of this, and he said if they would do this, and I desired it, that he would not make me stay, but that he did not want me to accept the proposition. Yes, I told defendant I would go if he would send me. No, I am not swearing against defendant because he failed to put up. I told him all the time that if I was called to court I would swear the truth about this whole matter. No, it is not a fact that I, my father, and my sister at any time entered into a conspiracy to extort money from defendant by threatening him with prosecution, nor did I ever intimate such a thing to defendant; nor did I, my father, or sister, in my hearing, ever state to defendant such a thing, or promise him to not swear against him if he was prosecuted in case he would pay us money, or send me off to school, or put me in business. No such threats were ever made by us or agreed to by us. I can't say the bottles shown me are the very bottles defendant brought me, but I believe they are. I identify the label by being torn in a peculiar shape on the turpentine bottle, and by a paper stopper being in it. I identify the small vial which had the red medicine by its shape, size, and general appearance, and it has some of the dried fluid in it, which is the same color. The whisky bottle looks just like the one I had and I think this is the one, because I never saw one like it before. I gave these bottles all to the county attorney some time ago. Some of them have paper stoppers, which I know. I did swear in the complaint which the county attorney wrote out and showed me, that this medicine was calculated to abort. I was bothered when I signed it, and I can't say that these medicines would do it, but defendant said they would, is why I swore it. I have told all the conversations had with my father about the money and school matters, as near as I can recollect."

Redirect examination: "Yes, I thought these medicines would abort because of their effect on me, and because defendant said they would, and it was understood between us that that was what they were for when he gave them to me."

Recross-examination: "I don't think that my father knew that I was taking this medicine until after my child was born. At one time I noticed that the bottles were misplaced where I kept them in my trunk, and father afterwards told me that he saw them in there, but thought nothing of it. He told me this after my child was born, and when I was telling him about taking the medicine."

Orrie Brown testified: "My name is Orrie Brown. I reside in Fisher County, Texas, about twelve miles west of Roby. Was living there in August, 1892. Am a sister of Livie Brown. Livie was pregnant in August, 1892. I know H. D. Cave. [Here she pointed defendant out.] I saw him bring her medicine twice. I saw him give her a dose of red medicine. I saw him bring the red medicine. About one week after bringing the red medicine he brought a bottle of turpen-

tine, a bottle of alcohol or whisky, and a black powder; was in the room and saw defendant dose out a dose of medicine and give it to my sister, and saw her take it as Mr. Cave walked out of the room. The dose was one teaspoonful of turpentine, two teaspoonfuls of the black powder, and enough whisky to dissolve the powder. This dose was put in a teacup. I often saw my sister take the medicine defendant brought her. I heard him give her directions how to take the medicine. I also heard Mr. Cave tell Livie the medicine would abort her. My sister took these medicines some time in August, 1892, in Fisher County, Texas. I often heard my sister complain of severe pains in her back and abdomen while taking these medicines. She complained more of the pains while taking the medicines than before or afterwards."

Cross-examination: "Mr. Cave brought the medicines with the black powder first, I think, but am not sure as to that. He brought her about one pint of the black powder. She took all of the black powder and the whisky. I don't think she took all of the turpentine. I don't know anything about my sister getting any $30 from Mr. Cave. I did not see Mr. Cave give my sister $2 at any time, but I saw her give him $2 and tell him she did not feel right to take money from a stranger that way. Defendant often offered us money but we did not take any of it. About the last of December, 1892, defendant came to our house, and he, my sister, and myself were sitting together in the room talking, when defendant took out a $5 bill and threw it in my sister's lap and said, 'I will give you that and as much more as you want if you girls will let me stay with you to-night.' My sister threw it in the fire and told defendant to leave; that she was not that kind of a girl. There was no understanding whatever between myself, my father, and sister before sister's child was born, nor afterwards, that we would not prosecute defendant if he would send her (sister) off to school or set her up in business. I never saw Cave, the defendant, drive up to our house in a buggy and deliver to my sister any goods or medicine. I never saw him with any medicine only in the house. Defendant often came there in a buggy, but if he brought anything in it I did not see it. No, we did not propose to defendant at any time that if he would pay us money we would not prosecute him; nor was there ever any such understanding between father, sister, and myself. Mr. Cave knew that father had threatened the courts. He did it because he said he would not let people in his absence ruin his family."

Joe Yantis testified: "My name is Joe Yantis. I live in Fisher County. Was a member of the grand jury at the April Term of the District Court of Fisher County, 1893. I remember a statement made by H. D. Cave to the grand jury, and can give substantially all he said. I may have forgotten some of it, but don't believe I have. Be-

fore he made his statement he was warned by the county attorney that any statement made by him could and might be used against him, and that he was not compelled to make any statement; that he was being investigated and could make a voluntary statement. Cave said he had come there to tell it all, and would freely do so. He said Livie Brown, sometime in August, 1892, asked him to get her some medicine that would produce an abortion on herself, and that he took her a bottle of calomel at one time, and at another a bottle of turpentine, a bottle of whisky, and some gunpowder, and that he dosed her out a dose of the medicines and gave it to her. He also told her how to take all the medicines. He said he gave the medicines to her to produce an abortion on her."

Dr. Keifer testified: "My name is F. Keifer. I am a physician, having been practicing medicine since 1867. Calomel given continuously for some length of time, such as a week or two, is calculated to abort. I do not regard it as a safe medicine to give to a pregnant woman. One teaspoonful of turpentine, with two teasponfuls of gunpowder in whisky, is calculated to produce an abortion. I would not give it. I would be afraid to give it, because it would be dangerous to the child and also to the pregnant woman."

No briefs with the record.

HURT, PRESIDING JUDGE.—This prosecution is based on article 538, Penal Code, which reads: "If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result." Transposed, if the accused shall use means to produce abortion, which are calculated to have that effect, he is guilty of an attempt to produce an abortion, though the means used shall fail to procure an abortion. Though the accused may intend an abortion, and may use means for that purpose, yet, if the means actually used were not calculated to have that effect, he is not guilty. The writer has serious doubts as to the sufficiency of the indictment. I think, under such a statute as this, the indictment should name the means, or state that they were unknown to the grand jury. But such an indictment as this, drawn under the statute, was held sufficient in the case of Watson v. The State, 9 Texas Criminal Appeals, 237. Did appellant administer drugs, medicines, to Miss Brown with the intent and for the purpose of procuring an abortion? If the testimony of the prosecution and the deliberate confession of the appellant, made to the grand jury, are true, he evidently did. Were the medicines, drugs, calculated to have that effect—produce an abortion? If Keifer swore the truth—and his testimony was not questioned by any person —they were.

There was no error in refusing a continuance for the testimony of Cliff Robinson. Appellant settled the fact that he administered medicines to Miss Brown for the purpose of producing an abortion, and the State could have sustained this part of her case, and yet concede the absolute depravity of Miss Brown. The other part of the case was made by the testimony of Dr. Keifer.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.