## JESS WEAVER v. THE STATE.

### No. 2912. Decided March 25, 1904.

**1.—Charge of the Court—Motive—Need Not Be Limited.**

Where another crime forms part and parcel of the motive and res gestae of the motive, it is not necessary to charge thereon.

**2.—Same—Intent Should Be Limited.**

There is a distinction between a charge on evidence tending to show motive and a charge on evidence tending to show intent; in the latter instance, where the facts are calculated to injuriously affect appellant and likely to be used by the jury for other purposes than illustrate intent, it is necessary for the court to limit the same to that purpose; it is not necessary to so limit motive for the crime. Henderson, J., dissenting.

**3.—Evidence—Tracks—Measurement—Stick.**

Where one measures a track with a stick, or other substance, he may testify to the accuracy of the measurement without producing the stick of measurement.

**4.—Same—Affidavit to Procure License.**

Where it appeared that there was no identity between the deceased and a certain affidavit to procure marriage license and it was shown that this could have been supplied by the deputy clerk whom defendant failed to summons as a witness, there was no error in excluding said affidavit.

**5.—Same—Cross-Examination of Adverse Witness.**

A party can make an adverse witness his own, but merely because he cross-examines him as to matters that discredit his examination in chief, this does not make him per se a witness of the party cross-examining him, and the testimony thus elicited may be impeached by the testimony of other witnesses.

**6.—Same—Original and Impeaching Testimony.**

Where defendant while on the witness stand was asked by the State whether he did not stay at a certain place on a certain night and as to a certain conversation between him and others which he denied, it was proper for the State to contradict defendant's statements by other witnesses, and to show where defendant did stay on said night and what he said and did, to be used both as original and impeaching testimony.

**7.—Same—Hearsay—Phone Message—Arrest.**

Where it appeared that the defendant proved by the sheriff that he ordered his deputy to arrest defendant before he went on the ground of the killing, the State could prove on cross-examination that the sheriff ordered the arrest on information from said deputy received over the phone.

**8.—Same—Contradictions—Mental Condition of Witness.**

Where a witness for defendant testified that a State's witness had made contradictory statements on a former trial, it was proper to permit the State on cross-examination to show the mental condition of the State's witness, at the time such contradictory statements were made.

**9.—Charge of the Court.**

The phrase "unlawfully killed as alleged," in the court's charge, could not have misled the jury to the effect that the court desired to convey the idea that the defendant committed the homicide as alleged, or was present, but merely had reference to the unlawful killing of the deceased.

**10.—Same—Premeditated Murder—Circumstantial Evidence.**

Where the evidence shows a culpable, premeditated lying-in-wait murder, the conviction can be sustained on circumstantial evidence.

Appeal from the District Court of Hill. Tried below before Hon. W. Poindexter.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The deceased had just returned to his home from Milford the day he was killed, about two hours before sundown. Just before night he took two water buckets and went to the spring for water; soon after he was gone several pistol or gunshots were heard by his wife and others, in the direction of the spring. His wife, her sister and Joe Hinson, a little while after the shooting, went towards the spring, which was near the house, and found Charley Martin, the deceased, dead near the spring. There were no eyewitnesses to the killing, but the next morning early the sheriff and officers were at the scene of the killing. The sheriff found tracks leading to and from the body of deceased which he identified as those of the defendant, by peculiarities of the heels and shape of defendant's boots. It was found that the size of the ball of defendant's pistol—which had been freshly fired—was the same as those taken from the body of deceased, etc. The question of motive is discussed in the opinion, based upon the facts therein mentioned. The killing occurred two and one-half or three miles from where defendant lived and about 400 yards from the place of deceased.

The defendant set up an alibi. It was also shown that near the scene of the killing and away from any public road there was evidence of where a horse had been hitched and fresh horse tracks appeared. Also that there were tracks made by a man near this place which were not defendant's tracks, and neither these horse tracks nor those of a man appearing near there were extensively investigated by the officers. The State also showed that within forty feet of the place of the homicide there were discovered evidences at a certain tree where the person committing the murder had evidently stood and awaited the coming of deceased, who was in the habit of going to this spring for water, and that the tracks around said tree were the same as those which the sheriff swore in his opinion were those of defendant. The State also showed that a few days before the homicide the deceased and defendant had had a heated dispute about defendant's coming to call on the wife of deceased, and that the deceased forbade him from speaking to the wife of deceased, and that defendant left saying he would see her anyway. The State also showed, in rebuttal to defendant's alibi, that he was seen walking down a lane away from his house at about 5 o'clock in the afternoon at a time when defendant swore he was at home.

*Webb & Stollenwerck, Thos. Ivy, B. D. Tarlton,* and *A. P. McKinnon,* for appellant.—To be admissible, the collateral facts must either alone or in connection with other evidence produced be capable of affording a reasonable presumption or inference as to the principal facts in the case. The rule excludes all collateral facts which tend to divert the mind from the real question and are calculated only to prejudice and mislead the jury.

The conduct or declaration of a party both before and after the prin-

cipal facts are admissible, provided they are sufficiently near in point of time and sufficiently significant of the motive or intent to be proved.

The rules which govern human conduct are to be reasonably applied in determining the admissibility of this character of evidence as in all investigations of fact. To render admissible the evidence questioned by the foregoing assignments of error, there must be more than conjecture that the alleged facts of illicit relationship, the alleged fact that the defendant gave medicine to produce an abortion to Mrs. Sarah Martin, wife of the deceased, the alleged fact that she took said medicine for the purpose of bringing about an abortion, and the alleged fact of the deceased's marriage to Sarah Martin and that which occurred in relation thereto, constituted a motive for the commission of the crime imputed to the defendant. Therefore this testimony, even if true, failing as it does, in itself or in connection with any other testimony introduced to produce in the minds anything more than a suspicion or conjecture that the defendant committed the homicide, the facts objected to did not constitute a motive for the same.

On account of the length of said testimony it is impracticable to set it out in detail. It will be called to the attention of the court in argument and other references in the brief. For the purpose of considering the assignments it may be summarized: Sarah Martin, wife of deceased, testified that before and after her marriage with Charley Martin she had sexual relations with the defendant. That these sexual relations ceased to exist and there was no effort on the part of the defendant to renew them for about a year before Charley Martin was killed. That at the time she married Charley Martin she was in a family way, and had her child something like six months after her marriage with Charley Martin. That the defendant is the father of her said child; that she got along very well with her husband and he never questioned the paternity of her child. That she never told anyone of the fact that the defendant had had illicit relations with her until after the killing of her husband, and that the first person she ever told it to was Tom Bell, who was at that time sheriff of Hill County. She testified that the defendant gave her medicine to produce an abortion, which she took, but that it had no effect on her at all. She further stated that she was engaged to Charley Martin for some time before she was married to him, and that the defendant wanted her to marry Charley Martin and came for her the night that she did marry.

Dr. McLain testified to having given the defendant a prescription for medicine which he, the defendant, said he wanted to produce an abortion on a woman on Mill Creek. That the medicine that he gave him would not produce an abortion. "The medicine I fixed up for him was liquor sedans." The testimony of Will Pasley, Mrs. Martin, mother of the deceased, Mr. Martin, father of the deceased, and Bud Sevier, was as to the facts and circumstances occurring at the time Charley Mar-

tin married Sarah Slate, which tended to show that the defendant was assisted in bringing about the marriage between the deceased and Sarah Slate. Sesure v. State, 1 Texas Crim. App., 19; Persons v. State, 3 Texas Crim. App., 240, and authorities cited; Gardner v. State, 11 Texas Crim. App., 265; John Fore v. State, 5 Texas Crim. App., 251; McKinney v. State, 8 Texas Crim. App., 626; Ryburn v. Moore, 72 Texas, 85; Wills on Circumstantial Ev., p. 51; Wharton on Circumstantial Ev.; 1 Greenl. on Ev., Lewis' ed., sec. 52, 54, and note; State v. Lapage, 57 N. H., 245; 24 Am. Rep., 69; State v. Fallon, 2 N. D., 510; Shaffner v. Commonwealth, 72 Pa., 60; Thayer v. Thayer, 101 Mass., 111; Com. v. Abbott, 130 Mass., 473; Billings v. State, 52 Ark., 303; Long v. State, 11 Texas Crim. App., 381; McCall v. State, 14 Texas Crim. App., 353; Kelley v. State, 18 Id., 262; Frances v. State, 7 Id., 501; White's Ann. C. C. P., sec. 815, p. 534; Taylor v. State, 22 Texas Crim. App., 529; Washington v. State, 23 Id., 336; Maines v. State, 23 Id., 568; People v. Welsh, 63 Cal., 167; Davidson v. State, 22 Texas Crim. App., 372; Leeper v. State, 29 Id., 63.

It is not competent for the State to introduce evidence for the purpose of impeaching a witness as to matters drawn out on cross-examination by the State, which matter is collateral and on an immaterial issue. Where a witness on cross-examination is asked about and testifies to entirely new matter not pertinent to any matter drawn out on his examination in chief, as to such new matter he becomes the witness of the party examining him and such party can not impeach him as to such new matter. The test as to whether a fact inquired of on cross-examination is collateral is this: Would the cross-examining party be entitled to prove it as a part of his own case tending to establish his plea? This evidence having been introduced for the purpose of impeaching the defendant should have been limited by the court in his charge to the jury for said purpose. Surrell v. State, 29 Texas Crim. App., 321; Johnson v. State, 22 Texas Crim. App., 206; Hart v. State, 15 Texas Crim. App., 202; Drake v. State, 29 Texas Crim. App., 265. Under third proposition see Woodward v. State, 42 Texas Crim. Rep., 188, case in point; Hill v. State, 18 Texas Crim. App., 665; Gulf C. & S. F. Ry. Co. v. Johnson, 9 Texas Ct. Rep., 102; Greenl. on Ev., sec. 449. Under fifth proposition: Golin v. State, 37 Texas Crim. Rep., 90; Thompson v. State, 29 Texas Crim. App., 208; Herd v. State, 43 Texas Crim. Rep., 575; Joy v. State, 41 Texas Crim. Rep., 46; Winfrey v. State, 41 Texas Crim. Rep., 538; Gatlin v. State, 40 Texas Crim. Rep., 116.

On question of admitting testimony of sheriff with reference to message over telephone: Rix v. State, 26 S. W. Rep., 505.

*Howard Martin,* Assistant Attorney-General; *J. E. Clark, N. C. Wear, B. Y. Cummings* and *C. F. Greenwood,* for the State.—In order that the court may properly appreciate the case, the record being very

voluminous, and that we may be better enabled to present it in an intelligent form, we deem it necessary to refer to some of the main facts proved by the State, which in a general way will furnish a history of the case. About 1895 the appellant married Miss Slate, and about a year afterwards Miss Sarah Slate began making visits to her sister's home. These visits continued periodically, and in the course of another year appellant's wife virtually became an invalid, and on account of this her sister Sarah continued her visits to appellant's home, and when she was between sixteen and seventeen years old the appellant began a series of illicit acts of carnal intercourse with her. This condition continued for a year or more, and as a result she became enceinte, and her testimony, which is corroborated by many facts and circumstances, shows that appellant was the author of her misfortune. At this point both became uneasy as to the final consequences, and simultaneous with this condition on her part the appellant for the first time began making visits to old man Martin's, the father of Charley Martin. The latter became acquainted with Miss Sarah Slate and in time they became engaged. Before the marriage, however, which followed, the appellant was delivering notes at various times to the deceased at his father's home, as was shown by the testimony of deceased's mother. It appears that prior to this appellant had never visited this home, and it does not appear that there were any neighborly relations existing between the deceased, deceased's family and the appellant, nor between the deceased and Miss Sarah Slate. Before the marriage occurred the appellant and this girl discussed with each other her condition and the consequences liable to follow. He insisted on her marrying; said it was for the best, and on one occasion told her that if she did not get married he would be killed and she would be driven away from home. It appears from the record that as soon as their unfortunate situation was discovered he began manifesting a lively interest in the result. Charley Martin is shown by the testimony of the physician and others to have been an ignorant and weak-minded boy, who still made his home at his father's, and worked around the place and on the farm, and it does not seem that he ever at any time formally called on Miss Slate prior to the marriage. In fact he did not mix much in society, but nevertheless appellant kept him in remembrance of her by bringing him notes, and thus kept them in touch with each other from the very time that he recognized the stubborn fact that something had to be done. On the night of April 11, 1898, Sarah Slate was at home, three miles from appellant and about three miles from the home of Charley Martin. Will Pasley, a young man in the neighborhood, was calling upon her, and the various members of her father's household had retired. It was between 12 and 1 o'clock in the morning, while she and her caller were talking near the door, that they discovered something crawling upon the ground, a few yards away from the house. Pasley concluded it was time for him to go, and as he left the appellant rose up from the ground

came to the door, spoke to the girl, told her to get ready, that he would take her to Charley Martin and they would be married. After making some slight changes in her apparel they started, and that, too, on foot; no one in the home knew she was going away, and appellant's presence was entirely unknown to them. It does not appear from the record that appellant's own wife on that night knew anything of his clandestine movements, or that of her sister. Appellant takes the girl from home to a point near Bud Sevier's house, a few hundred yards away, then leaves her and goes to Mr. Sevier's house, wakes him up, and asks for the loan of his buggy on the pretext that he wants to go to his father's. After procuring the buggy he rejoins the girl and drives her to old man Martin's house, two miles away, leaving her in the buggy on the outside of the gate; he arouses the family in waking up Charley Martin. After succeeding in this he notifies the latter that Sarah is out at the gate and to come on. Some protest is made by deceased, or at least some hesitancy is shown on his part in being thus unexpectedly awakened at 2 o'clock in the morning and called on to hasten off to a marriage at this unseemly hour, and although grown in years he appeals to his old mother for advice, who tells him that he does not have to go unless he wants to. The appellant in a peremptory manner, and with the emphasis of an oath, tells him to come on—go with the girl and be married, and Charley Martin went. When appellant sees that this part of his work is being successfully consummated he turns and goes home, and before daylight on that morning the marriage rites were performed by the Rev. Middleton, who lived in another part of the neighborhood, and then they immediately go to the home of appellant to make it their home. After this was accomplished the buggy was returned to Mr. Sevier, and when this marriage occurred the pregnant condition of the girl was between two and three months advanced, and the intercourse between appellant and his sister-in-law still continued. At this point another chapter occurred in the history of this case.

The appellant, knowing of her pregnancy and appreciating the fact that through physical development necessarily incident to nature's laws, her condition would become at once evident to the entire community, and especially known to her brothers, who well knew that she had been making her home with him, and that in the very nature of things the baby, unless destroyed, must be born in less than nine months subsequent to the marriage, the appellant then goes to Itasca, selects his physician, Dr. McLean, and calls on him for medicine for the purpose of producing an abortion, telling him that he wanted it for a man on Mill Creek. The doctor prepares the medicine, but is careful to fix such medicine as will not do the deadly work. This medicine the appellant takes and gives to the woman. She takes it for two or three days. He gives her two kinds, one a liquid and the other a powder. The doctor testifies that the medicine prepared by him would only make the baby stick the tighter, and it seems to have had that effect. He

also says that this was about the time that he heard of the marriage. The medicine having failed to accomplish the desired result and the pregnancy having now advanced three months more, the appellant decides to locate in the Panhandle. The deceased and his wife up to this time are still making their home with him. This move seems to have been sudden, no prior discussion of it, and no preliminary arrangements made to that effect. Charley Martin and wife then go to his father's to live, and appellant and his wife start to Vernon overland in a wagon. About the second or third night after his departure from the community he is back again, on foot; he turns up at the home of the witness Taylor Clayton in the nightime, who saddles up the mules and takes him within a few hundred yards of old man Martin's house. En route he tells witness that Sarah is in a family way and that it is best for her and Charley to leave the country. On reaching a point a few hundred yards from the house appellant dismounts and leaves witness holding the mules, and he then proceeds to the house at about 2 o'clock in the morning, when the entire household were asleep. Old lady Martin is suddenly awakened by a man raising the window in her room and next to her bed; she raises up and sees the man, does not recognize him, his hat is pulled down, his coat collar up and his voice disguised; she calls to him, but receives no answer. She inquires as to his identity, but receives no satisfaction except that he says he wants to see Charley. In her conversation with this man she awakens her husband, who is occupying the same bed with her, and the old man hears the voice at the window. He asks, "Ain't that you, Jess?" and appellant throws his hand to his hip and says yes, dropped his·head, and called for Charley to come to the lot. The mother told him her son did not go to the lot to any man unless she first knew what he wanted. At this time, 2 or 3 o'clock in the morning, Charley and Sarah were sleeping in an adjoining room. In a few minutes appellant went away without stating his business except that he wanted to see Charley "on particular business." Having failed to induce these old people to wake up their son, he goes back to Taylor Clayton and notifies him that he "did not get to see them." The witness Clayton then returned home with the mules, but as they started to go he saw appellant going back toward Martin's. In a short while, and before daybreak, Mrs. Martin says she heard him coming again; heard him at the wire fence. The old lady, moved no doubt by an intuition of danger to her son, arose, on hearing his footsteps again, and notified him not to come in. She says, "I talked to him and told him how he was doing. He said he was a man capable of attending to his own business. He said let him in just ten minutes. He kept insisting on Charley to get up and then insisted on both of them, Sarah and Charley, to get up." These circumstances were also proved by J. M. Martin, the father, who also stated that when appellant returned the second time on the night in question they finally let him in, woke up Charley and Sarah, and all

talked for a while in the house, and that then the appellant stated that his baby was sick in Fort Worth, and that he had come back for Sarah on that account. And after a while appellant walked off and induced Charley and Sarah to walk a piece with him. In this connection the State proved by J. M. Weaver, the father of appellant, in rebuttal, that on the morning of the night in question, and between daylight and sunrise, the appellant came walking through the gate on into his house, took breakfast there and then went to Itasca, seven or eight miles away,. caught the north-bound Katy train and returned to Fort Worth. Having failed to accomplish his purpose on this sudden and hurried trip back to old man Martin's, it seems that he resumed his trip to Vernon, Texas, and after residing there for a couple of months, Charley Martin and his wife moved there also and again made their home with appellant, and in the course of two or three weeks, as shown by the record,. the appellant leaves Vernon and returns to Hill County, leaving his. wife. Sarah Martin was still pregnant, and this was only about two months before she gave birth to a baby. In about a week after appellant had departed from Vernon his wife left and rejoined him in Hill County. Charley and Sarah remained a couple of weeks longer and then they returned, and in about three weeks the baby was born; this birth occurred on October 7th, after the marriage on April 11th preceding, less than six months between these two dates. Charley Martin and wife are now living on a little farm of her father's about three miles from appellant, and in the latter part of March, 1899, the appellant is seen by Sarah Martin on a horse and about a quarter of a mile from her house in the brush. On Friday preceding the assassination the appellant rides up to the house of Charley Martin, but in the mean time it develops, as shown by the testimony of Sarah Martin and appellant himself, the father of Sarah had warned Charley not to permit Jess Weaver to come on his premises again, and on the day in question the deceased, it seems, concluded to make a practical and emphatic application of this wholesome advice thus given him, and when he sees the appellant ride up he instinctively goes to his wife, who is on the opposite side of the house, and tells her of appellant's approach. She immediately goes on the inside. Joe Henson, who was working on the same place and making his home with Martin, was a few hundred yards away and was immediately called to the house by Martin. On reaching there the latter tells him "that Jess Weaver is there raising a fuss with him." Martin gets an ax and orders Weaver off the place and tells him not to speak to his wife, but appellant declares he will speak to her anyhow, and wants to know why Martin objects to him speaking to her, and Martin makes this very significant reply, "You know why." This answer of deceased is admitted by appellant in his own testimony. The appellant rides away, and as he does so, he tells the witness Henson "he will see Martin again," and in the light of subsequent developments we are justified in saying he kept his ominous

words.  He saw him at the spring, and for having asserted what little individuality he had, his life paid the penalty.  This meeting at the house was the first time he exhibited any evidence of having had his eyes opened to the duplicity and deception that had been practiced upon him.  Hitherto he had been as a toy in the hands of a designing man, but now he had thrown himself squarely across the serpentine path of the man who had simply used him to cover up, if possible, his own perfidy and dishonor, and then and there the appellant recognized that his progress was arrested.  On the 11th of April, the first of the following week, the deceased had returned home from Milford, and, as was his custom, he took the buckets about sundown and wended his way down the path to a spring for water.  This spring was about 400 yards distant.  In a few minutes four shots were heard ring out in the direction of the spring; they were heard by Mrs. Martin, Mrs. McCain and Joe Henson, who were at the house; neighbors also heard them.  This was between sundown and dark, and in a few minutes Martin's wife, Mrs. McCain and Joe Henson went to the spring and there found the lifeless body of the deceased.  A bucket of water was on either side of the little path, and the lifeless body on the bank of the branch.  It was prevented from rolling off by a little bush immediately upon the bank.  Neighbors arrived to watch beside the corpse till morning.  Tom Bell, the then sheriff, was notified by a 'phone message and was promptly upon the ground in the early morning.  Dr. Tankersly was sent for, and he minutely examined the body and found four bullet wounds, one in the front of the neck and ranging down at an angle of 45 degrees, another in the breast just to the left of the nipple and ranging down, the third in the right side below the arm pit, the fourth entering the left side and ranging toward the back bone, and the deceased powder-burned from the collar to the ears, showing that the firing was at close range.  One of the bullets was extracted by the doctor and turned over to the officers.

Upon his trial the appellant stoutly contended that he was at home three miles from the scene of the tragedy when it occurred, and that the only time he was absent from home on that afternoon was when he was driving some cows out of the wheat field of Lee Files between 4 and 5 o'clock.  The State proved by the witness Lewis Simon that he saw the appellant drive the cows out of the field between 4 and 5 o'clock, and that appellant then came out of the field, went into a lane, and instead of coming home, as contended by appellant, he proceeded down the lane, then towards the creek south, and that he last saw appellant as he disappeared behind witness' peach orchard, which was on the north slant of a hill, and that he noticed appellant had on a jumper.  On the next morning witness saw the tracks made by appellant on the outside of the wheat field; he noticed these tracks on down the lane and to a point three or four hundred yards south of the peach orchard, and that the tracks showed that the boot was run down.  The testimony of this wit-

ness, taken in connection with other testimony in the record, clearly shows that on the afternoon of the murder appellant drove the cows out of the field, but that when instead of turning back towards his home he came out of the field, turned down the lane, thence by the peach orchard of Simon, and then over the brow of the hill and on towards the creek, and, as the State contends, in the light of the testimony of the eyewitnesses and the subsequent facts as disclosed by circumstantial evidence, he proceeded on down the creek, hugging the brush, as it were, to the scene of the homicide. The witness Jess Denson, who resided just north of Simon, saw appellant drive the cows out of the field about 5 o'clock, then go in the lane and on down this lane to where it turned south, and then appellant turned south about 200 yards from Simon's house, and the last witness saw of him was when he disappeared over the hill, still going in a southerly direction, and this places him going toward the spring.

The witness Robert Tuggle lived about a mile southwest of the Simon place, and on the southwest side of the creek and about a mile or a mile and a half from the spring. On the afternoon of the homicide and between 4 and 5 o'clock he saw a man east of his house and on the southwest side of the branch near the brush, and as witness proceeded away from his house towards Iverson, he saw the same man again; the man was then on the creek which led in the direction of the spring. From the time that he first saw him to the time he last saw him the man had proceeded on down the creek a distance of four or five hundred yards. This witness at a later point during the progress of the trial was recalled and placed upon the stand again, and testified that when he first saw this man the man was near Sides' gate, and that when he saw him the second time he was in Richard Turner's hog pasture, southeast of Sides' gate, and that from the time he first saw this party till he last saw him he had traversed five or six hundred yards, and that he was still going in a southeasterly course. And in this connection, we say that in the light of the preceding and subsequent facts there is no doubt about this man being the appellant. And the last above named witness sees this man, shown to have been appellant, halfway between the latter's home and the scene of the killing, and he is shown to have been following the creek skirted with timber.

We now digress from this branch of the case and go back to the developments discovered after the arrival of Tom Bell. Mr. Bell heard of the killing about midnight and arrived upon the ground a little after daylight. He discovered a man's tracks leading to and from the body. These tracks showed that the boot or shoe which made them were both careened at the heel, one more than the other. A part of one of the heels was gone and this left a distinct impression. This was the inside of the right heel, and the track showed that this part of the heel was cut out. These tracks were followed from the body to an oak tree about forty feet away, where some one had evidently sat

down, and at the tree the same tracks were found. They were followed from this point several yards towards deceased's home to a thicket and back and forth and out to the plowed ground, clearly showing that the assassin was laying in wait and from the thicket watching for the approach of the deceased from his house. The witness followed the tracks about sixty yards west from the tree and to the white rock, which prevented them from showing. West of this point, however, he followed the tracks again, and on across the creek and into an old road, and along this road for 150 yards. After following them some distance further Bell measured the tracks—measured the heel, the foot and instep—and pursued it onto the prairie; occasionally on account of brush and other obstacles the track was lost, but always found again, and it was followed on to Richard Turner's hog pasture. The prairie land was higher than the timber and the tracks were between; they were followed on to the Files wheat field. Mr. Bell found the tracks going from the field to the spring, found them right along where the witnesses Simon, Denson and Tuggle had seen the appellant go the afternoon before as he left the wheat field and proceeded towards the place of the homicide. Bell not only found the tracks that led from the body to the wheat field, but from the latter place he followed the same tracks down to the spring. The tracks that led away from the crime also showed the man to have either been in a run or a fast walk. The appellant was arrested and on his feet were found a pair of boots that he admitted he wore the day before. They were both careened over; the heel of the right boot was partly gone, a part of half the heel on the inside being cut out and the measurements of the track and the boot fitted exactly. The boot had some round-headed tacks in it and the tracks showed the impression of the tacks. Mr. Bell sent J. R. Turner to appellant's home, and there the witness Turner found a pistol, a five-shooter, witnesses testify that it showed to have been very recently fired; the smoke from the fire was still upon it. and along the barrel; there was a cartridge in it which was cankered. The ball taken from the dead body was then produced when the pistol arrived, and it fitted it exactly.

On question of limiting evidence on motive and intent: Foster v. State, 32 Texas Crim. Rep., 39; Leeper & Powell v. State, 29 Texas Crim. App., 63; Hall v. State, 31 Texas Crim. Rep., 565; Sullivan v. State, 31 Id., 486.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life. This is the second appeal, the former opinion being reported in 3 Texas Ct. Rep., 639.

Appellant's second, third, fourth, fifth and sixth assignments of error all relate to the admission of testimony tending to prove motive, which evidence we held in the former appeal admissible for this purpose.

However, appellant insists that the evidence is not admissible for this purpose; and if so, it should be limited in the court's charge to the question of motive. In support of his first contention he cites us to Price v. State, 3 Texas Ct. Rep., 663. A casual reading of that case will show that we held that the previous adultery of appellant with deceased's wife was not admissible, since the killing grew out of a separate and distinct and altogether independent motive from that of adultery with. deceased's wife. In other words, adultery had nothing whatever to do with the killing. The evidence in the record before us shows that deceased married the sister-in-law of appellant, and that appellant had had carnal intercourse with her for some time prior to the killing. The evidence for the State strongly suggests that deceased was induced by appellant to marry his sister-in-law to cover up this illicit relation of appellant with said sister-in-law; and that he subsequently formed the design of killing deceased in order to renew his illicit relations with deceased's wife. We do not deem it necessary to collate all the evidence on this matter; suffice it to say, viewing the record as a whole, we believe all the evidence was germane on the issue of motive. Its remoteness, as suggested in the former appeal, would go to its weight and not to its admissibility. In Terry v. State, 8 Texas Ct. Rep., 570, we held that, where the court charged on motive, it was reversible error because the same was a charge on the weight of the evidence, citing to support this proposition Hudson v. State, 28 Texas Crim. App., 324; Leeper & Powell v. State, 29 Texas Crim. App., 63; Attaway v. State, 55 S. W. Rep., 45. The decisions make a distinction between a charge on evidence tending to show motive and a charge on evidence tending to show intent. In the latter instance, where the facts are calculated to injuriously affect appellant and likely to be used by the jury for other purposes than illustrate intent, it is necessary for the court to limit the same to that purpose. All the authorities hold that it is not necessary for the court to limit evidence going to show and make manifest motive for the crime. Where another crime forms part and parcel of the motive and res gestæ of the motive, it is not necessary to charge thereon.

Bill of exceptions number 7 complains that while the State's witness Tom Bell was on the stand, over appellant's objections he was permitted to testify that he cut a stick, and with said stick measured the foot-tracks and the boot of deceased, and a similar track leading to and from said dead body, and with such stick measured the boot which defendant was wearing the next morning after the homicide; and further stated that said measurement of said track made by him with the stick corresponded with the measurement of defendant's boot—the boot so measured being the boot defendant was wearing the next morning after the homicide. That the stick and track and boot were one and the same length. Appellant objected to this testimony on the ground that witness had stated he had said stick in his possession about the time of the first.

trial, and had given the same to the clerk of the court or some one representing the State, with the boots, pistol and pistol ball used in evidence; and because there was no effort made to find said stick and produce the same on the trial; and because the absence of the stick was not accounted for, and no effort was made to produce the same, make search for the same or account for its absence; notwithstanding the fact that defendant demanded the production of said stick; that said stick would be the best evidence as to whether or not it was the same length. The bill is approved with the explanation, "that the court privately instructed the clerk of the court to produce the stick, and the clerk reported to the court that he did not have the stick; that nothing but the boots were left in his charge, which he produced. No other effort was made to find the stick, and as a matter of fact the clerk did not search for it and did not have it in his possession. After the trial the stick was found in the sheriff's office, as the court was informed." We know of no rule of law to the effect that where one measures a track with a stick, or other substance, that he can not testify to the accuracy of the measurement without producing the stick of measurement. We do not think there was any error in the ruling of the court.

Appellant also complains that the court erred in excluding that portion of a book kept in the county clerk's office, showing the affidavit of deceased, Charley Martin, made before J. C. Killough, deputy county clerk—said affidavit being dated March 26, 1898—for the purpose of getting a license authorizing the marriage of deceased, Charley Martin, to Sarah Slate. Said affidavit was offered in connection with the marriage license introduced in evidence, as testimony tending to show that deceased, Charley Martin, was acting voluntarily and on his own responsibility in marrying said Sarah Slate; and as tending to contradict the evidence of the State to the effect that deceased was forced by defendant to marry Sarah Slate. This bill is approved with the explanation, "that it was shown by the evidence that J. C. Killough, the deputy who it was claimed took the affidavit, lived at Hubbard City, in Hill County, Texas; and the court stated he would grant process for Killough in behalf of defendant, and if Killough could state that deceased made the affidavit he would admit it, but no effort was made to procure Killough and no identity between deceased and the affidavit shown." Clearly, under this explanation, the evidence was not admissible.

The eighth bill of exceptions complains that the court erred in permitting Weaver, defendant's father, to testify that defendant returned to his house two or three days after he started to Vernon; that witness was getting ready for breakfast when he saw him; that it was a little while before sunup, between sunup and daylight; when witness first saw defendant there that morning he was coming from the gate to the house. Defendant stayed at witness' house until breakfast, and asked his brother Joe to take him back to Itasca; that he wanted to get there

by train time; that he (witness) did not know where defendant stayed all night; witness did not ask him, and defendant did not say. To the introduction of this testimony defendant objected on the ground that it was introduced for the purpose of contradicting defendant as to whether or not defendant had gone the night before to the house of old man Martin, the father of deceased, Charley Martin; the contention of defendant being that the issue as to whether or not defendant went the night before to the house of old man Martin was immaterial, and a collateral issue. The statement having been drawn out on cross-examination by the State of defendant as a witness, that he (said Weaver) had not on that night gone to the house of old man Martin, but went to his father's house from Itasca on his return from Fort Worth and arrived there, at his father's house, about 12 o'clock at night, and remained at his father's until the next morning when he returned to Fort Worth. It being further contended by defendant that said evidence introduced to contradict and impeach the correctness of the statement made by defendant for the first time on cross-examination of said defendant as a witness and by the attorney for the State, was improper, incompetent, irrelevant and prejudicial to the rights of defendant. Appended to this bill is the following qualification: "That the evidence showed deceased and wife went to and lived at defendant's house for about two weeks, during which time defendant had intercourse with her; that defendant left with his family for Vernon, and old man Martin and wife say that deceased and wife came to their house to live, and that the night of the second day after defendant left he came to their house between midnight and 2 o'clock in the morning and tried to get deceased and wife away, etc. Defendant denied this, but on the contrary swore that he returned to and remained at his father's house that night. This evidence of the father was therefore admissible both as direct and as impeaching evidence. Reference is also made to the evidence of old man Martin and wife, and the evidence of Mr. Clayton on this subject in the statement of facts." By referring to the evidence of the witnesses named it appears that defendant, about the time suggested, went to the house of deceased's father, and made a futile effort to get deceased and his wife to accompany him on this trip. He went off, was gone awhile, and returned; and on his earnest insistence was permitted to see deceased and his wife. It appears that upon this second visit he renewed his entreaties to get deceased and his wife to go with him to Vernon. We do not think this testimony would be impeaching the State's own witness. It was testimony elicited by the State on legitimate cross-examination of the defendant, as indicated by the court on the question of the motive for the crime. The State had a right, as original testimony, to introduce this unusual visit of defendant to deceased's father for the purpose of showing his intense interest and suspicious regard for the wife of deceased. If it could be used as

original evidence, then the fact that the predicate was first laid by asking defendant about the conversation would not render the testimony inadmissible. The record further shows that defendant denied many of the circumstances together with this untoward visit; and certainly it was proper for the State to introduce testimony going to discredit and disprove his testimony. To support appellant's contention he cites us to Woodward v. State, 42 Texas Crim. Rep., 188. In that case we held that, where a witness on cross-examination is asked about and testifies to entirely new matter not pertinent to any matter drawn out in his examination in chief as to such new matter, he becomes the witness of the party cross-examining him, and such party can not be impeached as to such new matter. We think this is a correct rule of evidence; but we do not think it supports appellant here, since the evidence offered by the witness Martin was pertinent to a matter drawn out on the cross-examination of the defendant. Of course, it is a well established rule that a party can make an adverse witness his own, but merely because he cross-examines him as to matters that tend to discredit his examination in chief, this does not make him per se a witness of the party cross-examining him. So we think the testimony was admissible, both as direct and impeaching testimony; and if admissible as direct testimony, it was certainly not necessary for the court to limit the same to the purpose of impeachment alone.

Appellant's ninth assignment of error complains of the admission of the testimony of Taylor Clayton. What we have said in reference to the testimony of the witness Martin disposes of appellant's contention as to the testimony of witness Clayton as it grew out of the same transaction.

The eleventh bill of exceptions complains that the court permitted Tom Bell to testify for the State that he had a conversation over the telephone, and he recognized Lem Lary's voice, and that he was the party he was talking to; that said Lary was his deputy, and after his conversation with him over the phone he ordered Lary to arrest defendant. Appellant objected on the ground that it was hearsay, immaterial, irrelevant, and conveyed to the jury the suspicions or opinion of Tom Bell, sheriff, that defendant was the party who committed the homicide, and was prejudicial to the rights of the defendant. This bill is approved with this explanation: "Defendant first proved by Tom Bell, on cross-examination, that he ordered his deputy, Lem Lary, to arrest defendant before he, Bell, went on the ground. On re-examination the State proved by Bell that he ordered the arrest on information received from his said deputy, Lem Lary, over the phone; and to this defendant objected." This testimony, with practically the same qualification by the court, was passed upon by us on the former appeal of this case, and we there held there was no error in the ruling of the court.

Bill number 12 shows that B. Y. Cummings, witness for defendant,

was introduced for the purpose of impeaching Mrs. Sarah Martin, wife of deceased, and testified: "That he was the stenographer who took down the testimony on the former trial of this cause; that Mrs. Sarah Martin then testified that after her marriage to deceased, Charley Martin, and while at Weaver's house, Weaver had intercourse with her, just the same as he did before I was married. Q. Just came and got in bed with you and your husband, your husband on one side and him on the other? A. Yes, sir. In answer to the question as to whether said witness testified before that Weaver came to her in her husband's room and woke her up, and that she got up out of their bed and went with the defendant into his and his wife's room and there had intercourse on the floor, stated that she did not so testify. On cross-examination said witness, over the objections of defendant, stated: Yes sir; at the time that she gave that testimony she had been on the stand for a long time; she was very much agitated, she had been subjected to a long and tedious examination by Mr. Tarlton, counsel for defendant; that the testimony of the witness just referred to was brought out on cross-examination." Counsel for defendant objected on the ground that said testimony was introduced solely for the purpose of showing that the witness had on a former trial testified as to the manner and circumstances she had sexual intercourse with defendant, and as contradicting witness as to the manner and circumstances under which she had had sexual intercourse with defendant as testified on this trial; that it was incompetent and improper to allow an outsider to make statements of his impression of the manner of the witness and the circumstances under which she testified. The testimony of the witness Cummings on cross-examination, as disclosed by this bill, was not improper, but was the shorthand rendering of the facts; and it certainly was germane and proper, if the main prosecuting witness, Mrs. Martin, had made a previous statement contradictory of that then being detailed by her, for the State to show the mental condition of the witness at the time of such contradictory statements being made.

Appellant also complains of the following portion of the charge of the court: "Among other defenses set up by the defendant is that of an alibi; that is, that if the offense was committed, as alleged, then the defendant was, at the time of the commission thereof, at another and different place from that at which such offense was committed; and therefore was not and could not have been the person who committed the homicide. Now, although you may believe from the evidence that the deceased was unlawfully killed, as alleged, yet if the evidence or want of evidence raises in your mind a reasonable doubt as to the presence of the defendant at the place where the homicide was committed at the time of the commission thereof, then you will give defendant the benefit of such doubt and find him not guilty." Appellant insists that this charge is erroneous, contradictory, and misleading, in that it is not left to the jury to find that Martin was killed under the

circumstances under which the evidence before the jury shows he was killed; but the proposition in the charge is that, although you may believe from the evidence that deceased was unlawfully killed as alleged —that is by Jess Weaver—with malice aforethought, it follows that if the jury should believe he was killed by Jess Weaver, there could not arise a reasonable doubt from any portion of the testimony as to his presence at the killing. The charge when considered as a whole could not have misled the jury. The phrase "unlawfully killed as alleged" would not be construed, in connection with the remainder of the charge, as meaning that Weaver killed him, but merely means that he was unlawfully killed.

Appellant's thirteenth assignment of error is that the verdict of the jury is contrary to the law and the evidence, and without evidence to support the same. To this we can not agree. The record is replete with the most fearful motive on the part of appellant for the homicide. The facts circumstantially demonstrate his guilt with that degree of certainty which precludes every other reasonable hypothesis than that of his guilt. The record is very voluminous, and we do not deem it necessary to rehearse the facts. Suffice it to say the facts show a culpable, premeditated, lying-in-wait murder, although established by circumstantial evidence. The facts and circumstances are of that degree of cogency and consistency leading on the whole to the irresistible conclusion that defendant and no one else committed this homicide. And so believing, and finding no error in the record authorizing a reversal, the judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### June 1, 1904.

BROOKS, JUDGE.—This case was affirmed at the recent Dallas term, and is now before us on rehearing.

The only question we deem necessary to review is the insistence in the motion for rehearing that the court erred in holding in the original opinion that the trial court committed error in failing to limit the evidence tending to show motive to the purpose for which it was introduced. Appellant's counsel in motion and in their able argument before the court insist that the decision cited in the original opinion, to wit, Terry v. State, 8 Texas Ct. Rep., 570, is at variance with all the other decisions of this court, and is not a proper enunciation of the law on the question. To answer appellant's contention we will review some of the authorities: In Naverrete v. State, 40 S. W. Rep., 791, Judge Henderson delivering the opinion of the court uses this language: "We presume, as stated before, that it was introduced for the purpose of tending to show motive on the part of appellant in the homicide. At least the testimony was admitted and it might have some bearing on

that issue. It appears that the court promptly checked the district attorney in attempting, as it seems, to use said testimony for another and illegitimate purpose; that is, merely to show that defendant was a bad man. It seems that the court acted upon the suggestion of appellant, and in the absence of a special charge requested on the subject and refused, we fail to see that the court was required to do more than was done; and we do not believe that the colloquy that ensued between the court and counsel on this subject was calculated to injuriously affect appellant. Nor was it necessary nor required, as insisted by counsel for appellant, that the court should limit this testimony in his charge to the question of motive on the part of appellant. Such a charge was not requested, and if given it appears to us would have been subject to criticism as a charge upon the weight of the testimony. The jury was not likely to appropriate said evidence to any other purpose than as evidence of motive."

In Foster v. State, 32 Texas Crim. Rep., 39, Judge Davidson delivering the opinion, the court say: "It is insisted that this evidence was introduced for the purpose only of showing the willfulness and deliberation on the part of defendant when testifying before the grand jury, and was therefore extraneous matter and should have been restricted to that particular phase of the case by the charge of the court. Deliberation and willfulness are not extraneous matters in perjury cases, but essential elements of the offense, and without which it can not be committed. Evidence which proves or tends to prove such issue goes to the very substance of the crime of perjury. It is only when the extraneous matter is admitted in evidence for a *specific collateral purpose* that the court is required to limit and restrict the testimony to such specific purpose. The rule invoked by defendant does not obtain when the admitted testimony proves or tends to prove the main fact."

It will be seen from these excerpts that the distinction is here clearly laid down, as enunciated in Terry v. State, supra, that is, the court makes the distinction between evidence tending to prove motive and that which tends to prove intent. If the crime is a collateral crime, and introduced for the purpose of illustrating the intent of the accused in the case then on trial, it is necessary under the decision to limit said collateral and independent crime to the specific purpose for which it was introduced. But where the evidence introduced is an essential element of the offense itself, such as motive, it is not necessary to limit the same in the charge of the court, because such evidence can be appropriated by the jury for but one rational purpose—i. e., to illustrate and make manifest the motive of appellant in the commission of the crime.

In Hall v. State, 31 Texas Crim. Rep., 566, evidence of previous assaults, quarrels, threats and ill treatment had been admitted. The court used this language: "The court did not err in failing to charge upon the effect of this evidence, and in omitting to restrict it as a fact

tending to prove motive or malice. The authorities cited by appellant sustain the proposition that when independent contemporaneous crimes, or crimes showing system, are adduced and relied on to connect defendant with the offense on trial, or to develop the res gestæ or to show intent, they should be restricted to this particular phase by appropriate instructions. The rule grows out of the necessity of protecting the accused against conviction of an offense not charged in the indictment, and to guard him from prejudice that might occur on account of such crimes being admitted as evidence. But the evidence under discussion is a part and parcel of this case, belongs to and grows out of it, is not an independent offense, and does not come within' the rule invoked by defendant. The instructions fairly presented the law of the case."

In Brown v. State, 24 Texas Crim. App., 170, the prosecution was for perjury alleged to have been committed by accused when he testified at the trial of one Williams for assault to murder. Upon the introduction of one Moore for the defense in the present case, the State offered and was permitted, over the defendant's objection, to read in evidence an indictment then pending against the said Moore, wherein the said Moore was charged with perjury upon the same trial as that in which defendant is charged to have committed perjury. Held, that though the indictment was not admissible to impeach Moore's competency as a witness, it was admissible as a matter to go directly to his credibility and as tending to show a motive for his testimony in this particular case; it being admissible for this purpose, it was not incumbent on the trial judge in his charge to limit and restrict it, inasmuch as it did not tend to exercise a wrong, undue or improper influence upon the jury as to the main issue.

In Crass v. State, 31 Texas Crim. Rep., 312, over appellant's objection, the prosecution was permitted to prove the prior assault and former conviction. The State relied on circumstantial evidence. The evidence objected to was offered to prove motive and ill will. Where a crime has been committed and the circumstances point to the party on trial charged with such crime, any fact tending to show him to be the perpetrator of the offense is admissible to prove motive, even though such fact or circumstance be remote; and it is competent to prove acts of the accused occuring prior to the assault under investigation, when the acts themselves, taken in connection with other facts or circumstances, prove or tend to show the animus of the accused toward the assaulted party. See this case for a long citation of authorities on the question.

In Sullivan v. State, 31 Texas Crim. Rep., 486, Judge Simkins, speaking for the court, said: "Antecedent menaces, quarrels and grudges may always be shown to prove malice. Anderson's case, 15 Texas Crim. App., 447; McKinney's case, 8 Texas Crim. App., 626. The testimony of the former attempt upon the life of Beaty only the day before the

present assault with intent to murder was committed, was certainly admissible to throw light on the acts of defendant, and prove motive. Carr v. State, 41 Texas, 543. There were no special charges asked, nor exceptions reserved to the general charge for not limiting the effect of the testimony to the proof of motive only, and we can not see how any injury was caused by the failure of the court so to charge, as we see no reason for believing defendant was convicted for the first assault."

We might multiply the authorities on this question, but in our judgment those already cited are sufficient to demonstrate that the court has uniformly held that it was not error for the court to omit to limit evidence showing motive. Appellant in his able argument insists there is no distinction between motive and intent. As used in the authorities in this court and other courts, there is a distinction; that is, the courts hold that evidence which is part and parcel of the offense, which tends to show the motive actuating the party at the time of the commission of the offense, is not necessary to be limited; whereas a collateral crime, not growing out of the crime in question, is introduced for the purpose of illustrating the intent with which the act was done, and this court has uniformly held that such testimony should be limited, because the jury might appropriate the testimony for other purposes than that for which it was legally introduced. If A assaults B to-day, and to-morrow A meets B and kills B, we can not see how or in what way the jury could use the previous assault except for the purpose for which it was introduced, to wit, to illustrate the deep-seated malice and motive he had for the killing and to make manifest to the jury the animus moving him at the time of the homicide. This is not, as appellant insists, an arbitrary distinction; in our opinion it is one well grounded in the authorities and philosophy of the law. For instance, if one burglarises a house and claims it was done through inadvertence or mistake, a contemporaneous burglary committed by said party is admissible to demonstrate and show to the jury that the burglary then on trial was not done through inadvertence or mistake. This character of testimony might reasonably be used by the jury for a purpose other than that for which it was introduced. This is the philosophic reason for limiting this character of testimony. But where, as stated in some of the authorities reviewed, the evidence is introduced to show malice, it becomes as it were an integral part of the case on trial, and it is not the duty of the court to limit said testimony. Believing that the original opinion is in all respects correct, the motion for rehearing is overruled.

*Motion overruled.*

HENDERSON, JUDGE (Dissenting).—In agreeing to the overruling of the motion for rehearing, I would state that I believe we were in error in holding that there is a difference in the duty of the court with reference to charging on motive and intent, to wit: that in the former the

court was not required to limit the testimony to the particular purpose of its introduction, while in the latter the court is required to do so. The authorities cited by appellant support his contention to the effect that where an extraneous crime is introduced to show motive or intent, there is no difference in the duty of the court with reference to limiting such testimony to the purpose of its introduction. But all the authorities with which I am familiar hold, that in either event it only becomes the duty of the court to limit such testimony, whether of motive or intent, where it might be used for some other purpose against defendant than for the particular purpose for which it was introduced. The testimony here complained of, and which the court did not limit, related to an attempted abortion of the wife of deceased by appellant, prior to her marriage with deceased. The evidence in regard to this matter did not show an extrinsic crime. Indeed it was no crime at all, the attempt being with means not calculated to produce an abortion, and so could not constitute an offense. Williams v. State, 19 S. W. Rep., 897; Cave v. State, 33 Texas Crim. Rep., 335; Fretwell v. State, 67 S. W. Rep., 1021. Not being an extrinsic crime, it did not become necessary for the court to limit its effect. The evidence in my view was introduceable to show the influence appellant exerted over deceased's wife, and to show his intimate relations with her, which he denied; and I do not believe the jury was likely to appropriate it to any other purpose.

As to the evidence of Weaver (appellant's father), it was admissible in the first instance to show appellant's conduct on the night in question, as suggesting appellant's interest in deceased's wife at that time, and his determined effort to have her go with him to Wilbarger County. When appellant rebutted this with testimony tending to show he did not go to his wife's father's house to see deceased's wife on the particular night, but went to his own father's house on that occasion, it then became pertinent on the part of the State to show that it was not true, as attempted to be proved by him, that he only went to his father's house on that occasion about breakfast time.

As to the bill on the production of the stick with which the witness Bell measured the boots, the main fact was the measurement and correspondence between the boots which witness testified he measured and the tracks. The stick he used was no more required to be produced than would a square or yard measure with which the witness might measure a track. Besides this, I think sufficient effort was made to find the stick.

With these views, I agree to the overruling of the motion for rehearing.